**PEAT, INC., an Alabama corporation, Plaintiff–Counter Defendant–Appellee,**

v.

**VANGUARD RESEARCH, INCORPORATED, a Virginia corporation, Defendant–Counter–Claimant–Appellant.**

No. 03–11565.

United States Court of Appeals, Eleventh Circuit.

July 21, 2004.

See also 304 F.3d 1249.

Scott B. Smith, Gary C. Huckaby, Bradley, Arant, Rose & White, LLP, Huntsville, AL, for Vanguard Research.

Mark Englehart, Rhon E. Jones, Beasley, Wilson, Allen, Main & Crow, P.C., Montgomery, AL, for PEAT, Inc.

Before CARNES and WILSON, Circuit Judges, and JORDAN *, District Judge.

JORDAN, District Judge:

Following a two-week trial, a jury found that Vanguard Research, Inc. breached its contract with PEAT, Inc. and appropriated PEAT's trade secrets in violation of the Alabama Trade Secrets Act, Ala.Code § 8–27–1 et seq. The jury awarded PEAT $325,981.01 in compensatory damages on the breach of contract claim, as well as $1,819,334.00 in compensatory damages and $8,890,000 in punitive damages on the trade secrets claim. The district court denied Vanguard's motions for judgment as a matter of law and for new trial, but reduced the punitive damages award to $78,000 and entered judgment accordingly.

Vanguard now appeals the adverse judgment on the trade secrets claim, but not the jury verdict or award on the breach of contract claim. Vanguard argues that there is insufficient evidence to support the verdict on the trade secrets claim, that it is entitled to a new trial due to the improper admission of a Rule 1006 summary exhibit purporting to list PEAT's trade secrets, that the award of compensatory damages is excessive, and that the evidence does not support an award of punitive damages. As explained below, we reject all of Vanguard's arguments concerning the sufficiency of the evidence, conclude that a new trial is required due to the erroneous and prejudicial admission of

the summary exhibit, and do not reach the challenges to the damages awarded by the jury.[1]

## I

Like most commercial litigation, this action was complicated, and had many twists and turns, both procedural and substantive. We summarize the proceedings and facts only insofar as necessary to provide context for our decision.

### A

The dispute between PEAT and Vanguard arose out of a marketing and license agreement between the two entities to create plasma energy systems, which use extreme temperatures generated by plasma energy to treat hazardous waste without leaving behind harmful byproducts. PEAT referred to this plasma energy technology as "Thermal Destruction and Recovery" (TDR), while Vanguard called it "Plasma Energy Pyrolosis System" (PEPS).

Vanguard started doing business with PEAT's prior parent company, Mason & Hanger, in the early 1990s through a series of non-exclusive marketing agreements. Vanguard essentially provided marketing and expertise in the area of government contracting, while Mason & Hanger provided technology for use in plasma energy systems through a subsidiary, Plasma Engineering Applied Technology, Inc. (old PEAT).

In 1994, Dr. Marlin Springer and other old PEAT engineers applied for a patent for a process to treat waste using plasma energy. The patent was issued in 1996 to

---

* Honorable Adalberto Jordan, United States District Judge for the Southern District of Florida, sitting by designation.

1. Although we reverse, we commend the district court for its handling of the trial and of the many issues presented during the two-week proceeding.

Dr. Springer as U.S. Patent No. 5,534,659, and became an asset of old PEAT.

Two years later, in 1996, several investors, including Dr. Springer, bought from Mason & Hanger the assets of old PEAT, including the '659 patent. The new company retained the PEAT name. Vanguard, which tried unsuccessfully to purchase old PEAT or be included as part of the purchasing group, continued to work with PEAT after it became a separate company.

PEAT and Vanguard entered into a "teaming agreement" in late 1996 to pursue a contract with the Tennessee Valley Authority. In August of 1997, PEAT granted Vanguard an exclusive license for its technology (described as "the system known as PEPS") for the program involving the TVA and for "all follow-on programs and systems to this initial program." Shortly thereafter, the parties submitted a proposal to the TVA for a Phase I project to develop a plasma energy system.

PEAT and Vanguard executed a new marketing and license agreement in December of 1997. This agreement did not grant Vanguard a license to make, use, or develop a plasma energy system. Instead, the agreement provided that a separate license would be negotiated for each subsequent contract, that Vanguard would use PEAT as the sole source for manufacturing all plasma energy systems, and that PEAT retained exclusive rights, title, and interest in all of its intellectual property (including technical and proprietary information). The agreement also contained a merger clause. At trial, PEAT asserted that this merger clause superseded the 1997 license it granted to Vanguard, while Vanguard maintained that the merger clause did not affect the 1997 license, which was separately provided for the TVA Phase I project and for all "follow-on programs and systems."

The prime contract for Phase I—which called for a fixed plasma energy system—was executed in February of 1998, and PEAT and Vanguard entered into a subcontract around that time for their work on Phase I. PEAT designed the system for Phase I in Alabama and assembled it at Vanguard's facility in Virginia during 1998. Throughout Phase I, Vanguard criticized various aspects of PEAT's work. Not surprisingly, at trial the parties presented very different versions of PEAT's performance, as well as what problems existed, how significant those problems were, and who was responsible for them.

In June of 1998, Vanguard made a proposal for Phase II of the project—which called for a mobile plasma energy system—and identified PEAT as a subcontractor. PEAT received a letter subcontract for certain tasks in Phase II from the government's prime contractor the following month, and thereafter began working with Vanguard on Phase II conceptual issues. Vanguard executed its Phase II contract with the prime contractor in November of 1998. Though the parties traded various proposals for the scope of work on Phase II, Vanguard and PEAT never executed a subcontract between themselves for Phase II.

Some of the work on Phase II was performed simultaneously with the work on Phase I. PEAT claimed that during its work on Phase II it shared much sensitive propriety information with Vanguard (though it also claimed that it had given Vanguard such information throughout the work on Phase I). Vanguard, for its part, denied that PEAT had passed on or divulged any trade secrets.

While undergoing Phase I testing in January of 1999, the plasma energy system designed by PEAT experienced an explosion which blew an 80–pound door off the incinerator. Again, the parties disa-

greed as to the causes of, and responsibility for, the explosion. Vanguard blamed PEAT's poor design—which it claimed was unsafe—for the explosion, while PEAT generally said the explosion was caused by the failure of various safety components and insufficient time to develop one of the relevant processes.

The following month, Vanguard ordered PEAT to stop work on Phase I and Phase II. According to Vanguard, it became clear after the explosion that PEAT could not do the job. PEAT, on the other hand, asserted that Vanguard used the explosion as a pretext for replacing PEAT as the provider of the plasma energy system. PEAT claimed that, following its termination, Vanguard misappropriated its trade secrets and used them to modify the Phase I system and subsequently build the Phase II system.

**B**

■ Whether or not information constitutes a trade secret is generally a question of fact under Alabama law. *See, e.g., The Soap Co. v. Ecolab, Inc.,* 646 So.2d 1366, 1372 (Ala.1994). To qualify as a trade secret under the Alabama Trade Secrets Act, information must (1) be used or intended for use in a trade or business; (2) be included or embodied in a formula, pattern, compilation, computer software, drawing, device, method, technique, or process; (3) not be publicly known and not generally known in the trade or business; (4) not be readily ascertained or derived from publicly available information; (5) be the subject of reasonable efforts to maintain its secrecy; and (6) have significant economic value. *See* Ala.Code § 8–27–2(1). *Cf. Ex Parte Miltope Corp.,* 823 So.2d 640, 643–45 (Ala.2001) (granting petition for writ of mandamus and setting

aside trial court's discovery ruling which required disclosure of customer orders received by corporation and of minutes of meetings of corporation's board of directors, as such information constituted trade secrets under § 8–27–2(1)). As the plaintiff, PEAT had the burden of establishing each of these statutory elements as to each claimed trade secret, *see Public Systems, Inc. v. Towry,* 587 So.2d 969, 971 (Ala.1991), and a hotly contested issue at trial was whether PEAT satisfied this burden.

**C**

Before the presentation of evidence, Vanguard filed a motion in limine objecting to PEAT Exhibit 145, a compilation of documents purporting to list PEAT's trade secrets.[2] In its motion, Vanguard argued that Exhibit 145 was not admissible as a business record under Rule 803(6) because Dr. Springer had said in his deposition that it was prepared for PEAT's counsel after the litigation began. R. 10:200. During argument on the motion, PEAT conceded that Exhibit 145 had been prepared by PEAT personnel, at the request of PEAT's counsel, in response to Vanguard's discovery request that PEAT identify what trade secrets were allegedly misappropriated. R. 16:1 at 17.

Although Vanguard reiterated its position that Rule 803(6) did not allow the introduction of Exhibit 145 because it was not prepared in the ordinary course of business, R. 16:1 at 18–19, PEAT nevertheless argued that Exhibit 145 was analogous to a discovery response. Alternatively, PEAT asserted that Exhibit 145 was "[its] best attempt to summarize the entire universe of trade secrets, to summarize voluminous documents that [it] had pre-

---

**2.** Exhibit 145 is reproduced in the appendix, and is described in more detail later in the opinion.

pared, [it] had ... provided to Vanguard." R. 16:1 at 19–20. Vanguard responded that PEAT could not introduce its own discovery responses because they were hearsay (though Vanguard could use such responses as admissions against PEAT if it wished), and that there was no list of trade secrets to summarize under Rule 1006: "This is something that was made where different people sat around and said, well, what can we come up with and claim to be trade secrets. It doesn't meet the criteria for admission. It is fine for discovery, it is fine to use to ask questions ..., but it's just not the kind of record that is allowed in under the rules of evidence." R. 16:1 at 20–22.

After PEAT replied that Exhibit 145 was a "classic summary" because the contents were voluminous and could not be examined in court, the district court overruled the objection and told Vanguard it could question witnesses "as to the veracity of the information in Exhibit 145." R. 16:1 at 22. The district court also permitted Vanguard to have a standing objection to Exhibit 145. R. 16:1 at 22.

Notwithstanding the standing objection allowed by the district court, Vanguard lodged a contemporaneous objection when PEAT sought to introduce Exhibit 145 through Dr. Springer. R. 16:2 at 231 ("Same objection as we discussed previously."). The district court noted the objection and, consistent with its prior ruling, overruled it. R. 16:2 at 231.

## II

After thorough examination of the record, including a review of the entire 2500–page trial transcript, we reject, without further discussion, Vanguard's argument that there is insufficient evidence to support the verdict on PEAT's trade secrets claim. The district court's denial of Vanguard's motion for judgment as a matter of law on that claim is therefore affirmed. *See* Eleventh Cir. Rule 36–1.

Reluctantly, however, we conclude that the district court erred in admitting Exhibit 145, and that the error is sufficiently prejudicial to require a new trial. In light of our grant of a new trial, we do not reach Vanguard's arguments that the compensatory damages are excessive and that the evidence does not permit an award of punitive damages.

## A

■■■ We review the admission of Exhibit 145 for abuse of discretion, which means that we look to see if the district court "made a clear error of judgment ... or ... applied an incorrect legal standard." *Alexander v. Fulton County,* 207 F.3d 1303, 1326 (11th Cir.2000) (citation and internal quotation marks omitted). Although Alabama law controlled the substantive issues in this diversity action, "the admissibility of evidence in federal courts is governed by federal law," *Borden, Inc. v. Florida East Coast Ry. Co.,* 772 F.2d 750, 754 (11th Cir.1985), so we turn to Rule 1006, the provision under which Exhibit 145 was admitted.

■■ In relevant part, Rule 1006 provides that "the contents of voluminous writings, records, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation[.]" Once admitted, a Rule 1006 exhibit constitutes substantive evidence. *See, e.g., United States v. Smyth,* 556 F.2d 1179, 1184 (5th Cir. 1977) ("Although the word 'evidence' does not appear in its text we construe the rule as treating summaries as evidence[.]"). And because "summaries are elevated under Rule 1006 to the position of evidence, care must be taken to omit argumentative matter in their preparation lest the jury believe that such matter is itself evidence

of the assertion it makes." *Id.* at 1184 n. 12.

■ The materials or documents on which a Rule 1006 exhibit is based must be made available for "examination or copying ... by other parties at [a] reasonable time and place," but need not be admitted into evidence. If they are not introduced, however, those materials or documents must be admissible under the Federal Rules of Evidence. In other words, Rule 1006 is not a back-door vehicle for the introduction of evidence which is otherwise inadmissible. *See generally* J. McLaughlin, J. Weinstein, & M. Berger, 6 Weinstein's Federal Evidence § 1006.03[3] (2d ed. 2004) ("Charts, summaries, and calculations are only admissible when based on original or duplicate materials that are themselves admissible evidence."); C.A. Wright & V.J. Gold, 31 Federal Practice and Procedure § 8043, at 527 (2000) ("Rule 1006 evidence may also be excluded where the source materials are inadmissible hearsay or even where just some parts of those materials are inadmissible hearsay."). For example, we explained in *United States v. Goss,* 650 F.2d 1336, 1344 n. 5 (5th Cir. Unit A 1981), that Rule 1006 does not permit "the admission of summaries of the testimony of out-of-court witnesses" because such testimony would be hearsay. *See also United States v. Francis,* 131 F.3d 1452, 1457–58 (11th Cir.1997) (rejecting challenge to admission of Rule 1006 summaries of intercepted phone calls, in part because underlying calls and transcripts were admitted into evidence); *United States v. Norton,* 867 F.2d 1354 1363 (11th Cir.1989) (assumptions in Rule 1006 exhibit must be " 'supported by evidence in the record' "); *United States v. Atchley,* 699 F.2d 1055, 1058–59 (11th Cir. 1983) (affirming admission, under Rule 1006, of chart reflecting telephone toll records which had themselves been introduced under Rule 803(6)).

■ Exhibit 145 fails to satisfy this foundational evidentiary requirement, as it is comprised of classic hearsay—statements made outside of court by persons other than the declarant, introduced for the truth of the matter asserted (that PEAT in fact had trade secrets it shared with Vanguard), and not admissible under any hearsay exception. Exhibit 145 contains numerous self-serving documents prepared by PEAT after this action was filed: (a) a list prepared by a PEAT engineer of 109 "[t]rade secrets shown, discussed, or provided to [Vanguard];" (b) a "recap" of "[t]rade [s]ecrets provided to [Vanguard]" dated January 7, 2000, with conclusory statements like "[c]hamber configuration trade secrets include the size and shape of both rectangular and cylindrical chambers, instrumentation locations, and entrance and exit locations for the various chamber penetrations when used to process a mixture of organic and non-organic waste materials in a reducing atmosphere to produce a syn-gas;" and (c) a checklist, dated December 30, 1999, and devoid of explanation, of 23 PEAT "trade secrets." Exhibit 145 also includes a copy of the '659 patent issued to Dr. Springer on July 9, 1996, and, worst of all, two memoranda (each seven pages long) prepared by Dr. Springer, PEAT's principal and corporate representative, on January 14, 2000, after the litigation began. The memoranda, though similar, are not identical. In the first memorandum, Dr. Springer provides a definition of trade secrets which is broader than that set forth in Alabama law. Dr. Springer prefaces the second memorandum with the following sentence: "The following is a discussion of *process capabilities* and *design and manufacturing issues* that include proprietary information and trade secrets provided to Vanguard by PEAT since 1992."

Dr. Springer goes on, in each of the memoranda, to make the following conclu-

sory statements and claims, many of which go beyond the existence of trade secrets and comment on Vanguard's alleged misappropriation and intent:

> "Since 1992 ... PEAT personnel have continually shared many trade secrets with [Vanguard]."

> "It became clear early in the PEPS Phase [I] Project that Vanguard's intent was to assimilate ... trade secrets associated with the design, manufacturings, and procurement of key equipment and major subsystems (PEAT's designated role)."

> "The source of this knowledge [i.e., the technology] and basis for considering it a trade secret was the lack of information available in the industry."

> "[K]nowledge of different vendor capabilities to meet ... specifications is considered a trade secret."

> "The processing chamber and control system is highly proprietary and the detail design of both are considered trade secret."

> "It also became evident that Vanguard employees had been instructed to mount a relentless effort toward gathering sufficient trade secret information in order to take over design, manufacturing, procurement, integration, and operation of future PEPS."

As noted earlier, Exhibit 145 was not compiled in the ordinary course of business. Instead, PEAT and its employees (including Dr. Springer) prepared Exhibit 145 during the course of this litigation to respond to Vanguard's discovery request that PEAT identify what trade secrets were allegedly misappropriated. Dr. Springer essentially admitted that Exhibit 145 was overbroad, as he compiled the information "to include everything [he] *thought might be* a trade secret." R. 16:2 at 264, 267 (emphasis added). Moreover, as was made clear below, Exhibit 145 was based in large part on the first-hand

knowledge of PEAT's employees. R. 16:1 at 17 (PEAT's counsel: "it was prepared by PEAT personnel ... in response to a request ... asking PEAT to identify what trade secrets we contended were misappropriated by Vanguard"); R. 16:1 at 264, 445 (testimony to the same effect by Dr. Springer). Thus, Vanguard correctly argued below that the underlying materials or information on which Exhibit 145 was based were not admissible under Rule 803(6) because they were prepared during, and for use in, litigation. R. 16:1 at 19. *See Noble v. Alabama Dept. of Environmental Management,* 872 F.2d 361, 366 (11th Cir.1989) (document prepared in anticipation of litigation is not "compiled as a matter of regular practice" for purposes of Rule 803(b)). That meant that Exhibit 145 could not be introduced under Rule 1006. "Summaries of records prepared for litigation are indeed inadmissible[,] ... and inadmissible documents are not made admissible by being summarized." *AMPAT/Midwest, Inc. v. Illinois Tool Works, Inc.* 896 F.2d 1035, 1045 (7th Cir.1990). *See also Hackett v. Housing Authority,* 750 F.2d 1308, 1311–12 (5th Cir.1985) (race of each landlord, which was determined based on conversations with a few owners, constituted inadmissible hearsay, and could not form part of Rule 1006 exhibit); *Paddack v. Dave Christensen, Inc.,* 745 F.2d 1254, 1260 (9th Cir.1984) (audit report should not have been admitted under Rule 1006 because it was based in part on information derived from "[u]nion sources ... not subject to cross-examination," and witness could not identify what portions of report were not derived from inadmissible hearsay). In sum, Exhibit 145 was based on inadmissible hearsay and contained conclusory allegations concerning Vanguard's alleged misappropriation and intent. The district court abused its discretion in admitting it under Rule 1006.

## B

■ Not every evidentiary error, of course, requires reversal. Our cases, consistent with Rule 61 of the Federal Rules of Civil Procedure,[3] hold that a new trial is warranted only where the error has caused substantial prejudice to the affected party (or, stated somewhat differently, affected the party's "substantial rights" or resulted in "substantial injustice"). *See, e.g. Hall v. United Ins. Co. of America*, 367 F.3d 1255, 1258–59 (11th Cir.2004) ("substantial prejudice"); *Alexander*, 207 F.3d at 1330 ("substantial injustice"); *Noble*, 872 F.2d at 367 ("affect substantial rights"). Notwithstanding the difference in terminology, the inquiry is always directed to the same central question—how much of an effect did the improperly admitted or excluded evidence have on the verdict?

■ To answer this question, we look to a number of factors, including the number of errors, the closeness of the factual disputes (i.e., the strength of the evidence on the issues affected by the error), and the prejudicial effect of the evidence at issue. We also consider whether counsel intentionally elicited the evidence, whether counsel focused on the evidence during the trial, and whether any cautionary or limiting instructions were given. *See, e.g., Aetna Cas. & Sur. Co. v. Gosdin*, 803 F.2d 1153, 1160 (11th Cir.1986); *Nettles v. Electrolux Motor AB*, 784 F.2d 1574, 1581 (11th Cir.1986). Every case must of course be evaluated on its own terms, but our decisions provide some guidance as to when error is harmless. *Compare, e.g., Alexander*, 207 F.3d at 1329–30 (evidentiary error found harmless where there were proper limiting instructions and "the verdicts were the product of

such one-sided evidence" such that it was "unlikely, indeed remote, that the jury could have been swayed erroneously by the wrongfully admitted evidence"), *with, e.g., U.S. Steel, LLC v. Tieco, Inc.* 261 F.3d 1275, 1288 (11th Cir.2001) (improper admission of state judicial opinion required a new trial where opinion was used by one of the parties "throughout the trial" to help establish disputed facts and counsel told the jury in closing argument "to use the opinion to make credibility determinations"); *Gosdin*, 803 F.2d at 1160 (reversing where there was only circumstantial evidence (though "substantial" according to the opinion), no limiting instructions were given, and counsel asked a key witness about the wrongfully admitted evidence); We do not lightly cast aside the result of a complex two-week jury trial. But we are convinced that the admission of Exhibit 145 caused substantial prejudice to Vanguard and that a new trial on the trade secrets claim is required.

First, Exhibit 145 went to a critical issue in this case—whether PEAT had trade secrets as defined by § 8–27–2(1). As noted earlier, PEAT had the burden of proving each of the statutory elements as to each claimed trade secret. *See, e.g., Towry*, 587 So.2d at 971.

Second, Exhibit 145 was prejudicial. It contained numerous hearsay assertions by non-testifying PEAT employees with suggestive headings concerning what trade secrets existed and were provided to Vanguard. To make matters worse, Dr. Springer made conclusory accusations against Vanguard in his two memoranda and even commented on Vanguard's alleged intent. These statements (really ac-

---

**3.** In pertinent part, Rule 61 provides: "No error in either the admission or exclusion of evidence ... is ground for granting a new trial or for setting aside a verdict ... unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."

cusations) by Dr. Springer meant that Exhibit 145 was not confined to whether PEAT had trade secrets, but carried over to the separate questions of whether Vanguard misappropriated any of those secrets in violation of Alabama law, and whether Vanguard's misappropriation was "willful and malicious," the standard for awarding punitive damages under the Alabama Trade Secrets Act. ALA.CODE § 8–27–4(3); R. 20:2 at 2528 (jury instruction).

Third, even though PEAT used Exhibit 145 with its witnesses to establish the existence of trade secrets, the evidence on the issue was close. As discussed below, PEAT's own witnesses admitted that Exhibit 145 was overbroad, and generally were not able to identify trade secrets with much particularity. Moreover, Vanguard presented a fair amount of evidence suggesting that PEAT did not have any protected trade secrets.

Looking first at PEAT's own evidence, Dr. Springer, who was PEAT's corporate representative, testified (a) that Exhibit 145 was "a list of everything that PEAT personnel, myself and my engineering staff, felt constituted proprietary and technical information that *included* trade secrets," R. 16:1 at 231 (emphasis added); (b) that Exhibit 145 was a list of "everything [he] *thought might be* a trade secret," R. 16:2 at 264, 267 (emphasis added); (c) that one of the items in Exhibit 145—emissions test data sent to state agencies—was claimed as a trade secret even though it was available for public review, R. 16:1 at 265–66; and (d) that there was "some overlap" in the list of trade secrets in Exhibit 145, R. 16:1 at 273. Thomas Kelly, PEAT's chairman of the board (and a 20% shareholder), acknowledged that, prior to suing Vanguard, PEAT did not have a list or inventory of its trade secrets. R. 16:3 at 408. Moreover, when PEAT sold its assets to DAE Technologies in late 2001 and early 2002, and conveyed all of its

intellectual property, not all of the trade secrets listed in Exhibit 145 were contained in the schedule to the contract detailing the trade secrets being sold to DAE. R. 16:3 at 408–13; Def. Exh. 321. Mr. Kelly had an explanation for this apparent discrepancy based on his reading of the DAE contract and the schedule—e.g., he said that the term "all data" covered what was not specifically listed, R. 16:3 at 413—but the important point is that his testimony on this issue was not overwhelming.

PEAT's experts did not fare much better in specifically identifying the trade secrets, and sometimes presented alternative versions of what the trade secrets were. Richard Lindsay, a chemical engineer specializing in thermal dynamics and heat transfer, testified that the items listed in Exhibit 145 were "normally considered to be trade secrets within the practice in [the] industry," R. 16:4 at 761, but he hedged his answer on cross-examination, saying that the items were "*areas* that would typically be areas for consideration of the trade secrets," R. 16:4 at 780 (emphasis added). When asked if the list in Exhibit 145 was vague, he conceded that "trade secrets generally are relatively elusive," R. 16:4 at 780–81, and when asked what it was about specific items in Exhibit 145 (e.g., rapid quench of gases) that made them trade secrets, he answered as follows: "I probably can't tell you exactly what it is because I couldn't. But I can tell you ... the general area." R. 16:4 at 781. When questioned further, Mr. Lindsay said (somewhat tautologically) that "the result that produces the result you want defines the trade secret," and admitted he was "just saying this is the area that trade secrets lie in. I can't give you the exact trade secret." R. 16:4 at 782, 783. In the end, Mr. Lindsay said that trade secrets might be the "way the whole system fits together," without further elab-

oration. R. 16:4 at 784, 787, 789. Alternatively, he said that, with respect to some items that were repeated in some form or another in Exhibit 145, "the trade secret is where it's placed in the process." R. 16:4 at 792. PEAT's other expert, Thomas Eddy, a mechanical engineer with a master's degree who did his thesis on plasma, admitted that 10 of the items in Exhibit 145 were included in Dr. Springer's patent and therefore were not trade secrets. R. 16:4 at 851. Mr. Eddy identified some specific matters that he believed were trade secrets (e.g., the configuration of the interiors, the design of the chamber, and the refractory information), and testified generally that, aside from the patent, the items listed in Exhibit 145 were trade secrets in the industry. R. 16:4 at 853–54, 875. Yet when asked on direct examination to identify some examples of PEAT trade secrets, Mr. Eddy could not always be specific: "[A] lot of these are tied together. It's not like you can just separate them. They are kind of in groups." R. 16:4 at 852. Indeed, on cross-examination, Mr. Eddy could not point to a single specific formula that was a PEAT trade secret and was given to or shared with Vanguard. R. 16:4 at 917.

For its part, Vanguard presented evidence that PEAT did not have any trade secrets under Alabama law. John Sumner, one of Vanguard's founders and officers, and a deputy program manager for the plasma energy system program, testified that although PEAT personnel discussed proprietary information at meetings with Vanguard (like a meeting in January of 1998), they never referred to such information as trade secrets. Mr. Sumner also said he did not recall anyone at PEAT using the term trade secrets. R. 16:6 at 1121. John Vavruska, Vanguard's expert on chemical engineering, testified that there were about 24 patents issued for the use of plasma for waste, and that proprietary information did not

necessarily constitute trade secrets. R. 16:6 at 1181, 1187. He also stated that "none" of the items listed in Exhibit 145 were trade secrets, explained why he so opined, told the jury that about two-thirds of the items in Exhibit 145 were covered by claims in the '659 patent or could be readily inferred from language in the patent by someone with reasonable skill, and testified that the general incantation of a process or formula did not constitute a trade secret unless PEAT provided specifics. R. 16:6 at 1189, 1254, 1266–67. Jay Ramamurthi, a Vanguard industrial engineer and project manager, stated that Vanguard did not use any PEAT trade secrets on Phase II, and explained how Vanguard was able to complete the system for Phase II without using PEAT's unique technology or trade secrets. R. 16:8 at 1725–28. John Kantak, a Vanguard senior vice-president, explained that when VRI and PEAT engineers worked together in teams and shared information, the data Vanguard requested from PEAT engineers was not trade secret information. R. 16:8 at 1978–79. Finally, Gordon Smith, Vanguard's corporate representative, told the jury that the 1998 Phase II work by PEAT was not marked as trade secrets. R. 20:1 at 2334.

Like PEAT's witnesses on the issue of trade secrets, Vanguard's witnesses were repeatedly challenged about their testimony on this topic, and we do not mean to suggest otherwise. For example, Mr. Vavruska, though not pressed on specifics, conceded on cross-examination that information for use in a specific process (i.e., a unique application to one's own process) could be a trade secret. R. 16:6 at 1262. And Mr. Ramamurthi admitted, also on cross-examination, that there were "unique" and "proprietary" aspects to Vanguard's Phase II system, R. 16:8 at 1747, thereby suggesting that PEAT's system was also unique and proprietary in some

ways, and maybe even included specific trade secrets. What matters for our purposes, however, is that Vanguard put on substantial evidence—from both fact and expert witnesses—to counter the claim that PEAT had trade secrets as defined by § 8–27–2(1).

Fourth, PEAT's reliance on Exhibit 145 at critical times showed how important it was in the evidentiary puzzle. When Vanguard moved for a judgment as a matter of law on the trade secrets claim, the district court asked "What are the trade secrets?" PEAT responded that "[t]hey were identified specifically by Dr. Eddy," and told the district court that Exhibit 145 "listed" the trade secrets. R 16:8 at 2421 (explaining that the trade secrets were "the use of [the process]" or the "knowledge of what not to use").[4] Then, in closing argument, in an effort to convince the jury that it had trade secrets, PEAT invoked Exhibit 145: "You will have . . . Exhibit 145 back in the jury room with you. And you heard all the evidence about why it was created and what all is on it and the groups of things that are on it and all that." R.20:2 at 2549.

Fifth, because disputes between the parties as to Phase I had been submitted to arbitration, PEAT's trade secrets claim was limited to trade secrets obtained by Vanguard "apart from the Phase I subcontract." R. 20:2 at 2503 (jury instruction). There was no clear demarcation from the evidence at trial as to which trade secrets, if any, satisfied this limitation, and the general verdict, R. 21:215, does not identify what trade secrets PEAT proved to the jury's satisfaction.

Sixth, as far as we can tell, the district court did not give any limiting instruction on the portions of Exhibit 145 which contained inadmissible hearsay or Mr. Spring-

er's conclusory comments and allegations about Vanguard's alleged misappropriation and intent. The district court read the statutory definition of a trade secret to the jury, and instructed the jury that in deciding what trade secrets existed it was not bound by the testimony of any witness or the notation on any document. R. 16:2 at 168–69, 206–07; R. 20:2 at 2512–13. The district court also told the jury that a patent is a matter of public record, and that information disclosed in a patent cannot be a trade secret. R. 20:2 at 2518. These instructions, however, did not sufficiently eliminate or reduce the prejudicial effect of the inadmissible evidence and statements in Exhibit 145.

III

The trial transcript provides no clear answer as to what trade secrets PEAT had, if any, in Phase II. As we see it, the evidence allowed the jury to find for either side on this threshold issue. Because the evidence was so close, the admission of Exhibit 145 constituted reversible error.

The jury verdict and judgment in favor of PEAT on the trade secrets claim is reversed, and that claim is remanded for a new trial. We reject Vanguard's argument that PEAT presented insufficient evidence on the trade secrets claim, and do not reach Vanguard's arguments concerning the compensatory and punitive damages awarded by the jury on that claim.[5]

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

WILSON, Circuit Judge, concurring:

I agree with the result in this case. I write separately to emphasize that it is only with great reluctance that I concur

---

4. The district court, in denying Vanguard's motion, said it would let the trade secrets claim "go to the jury and see if they can sort it out." R 16:8 at 2421–22.

5. The jury's verdict in favor of PEAT on the breach of contract claim is not affected by the grant of a new trial, as Vanguard did not appeal from that verdict.

that the error in admitting Exhibit 145 was sufficiently prejudicial to warrant a new trial.

My primary concern is whether Vanguard suffered any demonstrable prejudice; it appears that Vanguard had access to Exhibit 145 long before trial, and had ample opportunity to cross-examine PEAT's witnesses about whatever problems existed in the evidentiary submission. In addition, PEAT's counsel crafted Exhibit 145 in response to a discovery request from Vanguard; it is somewhat ironic that Vanguard now argues to have the judgment overturned as a result of the very materials it asked PEAT to prepare.

I am further concerned about the practical considerations of remanding this matter for a new trial. We now allow Vanguard another bite at the apple in a case in which we have already rejected the majority of Vanguard's arguments, thus upsetting our strong interests in finality and efficiency. This matter will now be litigated again, at significant time and expense to the parties. Yet, Exhibit 145 contains inadmissible hearsay that very well could have made a difference to the jury.

As our predecessor court has written, "[a]fter a long and hotly fought trial, an appellate court is reluctant to overturn the rulings of a district judge." *Ramos v. Liberty Mut. Ins. Co.,* 615 F.2d 334, 343 (5th Cir.1980). It is not lightly that we disturb a trial judge's evidentiary findings, and it is with even greater unease that we interfere with the result reached by a jury after an otherwise well-litigated case. However, this was a complex and often confusing matter that turned on close factual questions. In addition, the district court did not give a limiting instruction with regard to any of Exhibit 145's evidentiary problems. The presence of such an instruction could very well have led us to a different result today.

As the Eighth Circuit has noted, "[w]here the subject matter of the litigation is simple, the evidence straightforward, and the legal issues unconfused, courts are properly reluctant to overturn the jury's verdict and to grant a new trial." *Coast–to–Coast Stores, Inc. v. Womack–Bowers, Inc.,* 818 F.2d 1398, 1403 (8th Cir.1987). The present case presents the infrequent occasion in which an error justifies a new trial—a result we only reach with great caution.

APPENDIX

TRADE SECRETS

CONFIDENTIAL RESTRICTED ACCESS

CV-99-BE-2553-NE
Plaintiff's Exhibit _145_
July 15, 2002

PEAT 163648

# 1168

Trade Secrets shown, discussed, or provided to VRI

| | Group | Area | Element |
|---|---|---|---|
| 1 | Design | Chamber | Configuration of interior |
| 2 | Design | Chamber | Entrance locations |
| 3 | Design | Chamber | Exit locations |
| 4 | Design | Chamber | Heat capacities |
| 5 | Design | Chamber | Instrumentation locations |
| 6 | Design | Chamber | Mix chamber theory and design |
| 7 | Design | Chamber | Oxidant addition |
| 8 | Design | Chamber | Oxidant addition locations |
| 9 | Design | Chamber | Refractory actual test data |
| 10 | Design | Chamber | Refractory chemical compositions |
| 11 | Design | Chamber | Refractory environmental temperatures |
| 12 | Design | Chamber | Refractory use families |
| 13 | Design | Chamber | Torch impacts |
| 14 | Design | Chamber | Water cooling impacts |
| 15 | Design | Controls | Negative pressure impacts |
| 16 | Design | Controls | Oxidant impacts |
| 17 | Design | Cooling system | Function and location of PEAT cooling system |
| 18 | Design | Cooling system | Heat loading of systems |
| 19 | Design | Cooling system | Impact of torch system |
| 20 | Design | Cooling system | Torch cooling system |
| 21 | Design | Feed system | Continuous vs. batch impacts |
| 22 | Design | Feed system | Feed liquid locations |
| 23 | Design | Feed system | Feed liquid method |
| 24 | Design | Feed system | Feed materials impacts and characteristics |
| 25 | Design | Feed system | Feed solid methods |
| 26 | Design | Feed system | preprocessing impacts |
| 27 | Design | General | Gas flow measuring & volume calculations |
| 28 | Design | General | Gases to sample for |
| 29 | Design | General | Nitrogen locations - experience determination |
| 30 | Design | General | Sub-system relationships and impacts |
| 31 | Design | Hot pipe | Hot pipe refractory type |
| 32 | Design | Hot pipe | Use to transport gasses maintain hot and heat dissipation |
| 33 | Design | Operations | Pre-heat system function, calibration, standby, condition |
| 34 | Design | Operations | Preheat system configuration |
| 35 | Design | Operations | Sampling gases location |
| 36 | Design | Scrubber | Alternative methods for rapid quench of gases |
| 37 | Design | Scrubber | Bag house constraints |
| 38 | Design | Scrubber | Bag house pitfalls |
| 39 | Design | Scrubber | Bag house use safeties |
| 40 | Design | Scrubber | Bag house uses - and remedies if required to use |
| 41 | Design | Scrubber | High temperature filter constraints] |
| 42 | Design | Scrubber | High temperature filter uses |
| 43 | Design | Scrubber | Scrubber system flushing points |
| 44 | Design | Scrubber | Scrubber system variables |
| 45 | Design | Scrubber | Slow quench problems and issues and critical temperatures |
| 46 | Design | Tap | Tap into cooled cart system |
| 47 | Design | Tap | Tap into water system |
| 48 | Design | Tap plug | Don't use electrical, gas, lift, mechanical and others |
| 49 | Design | Tap plug | End configuration |
| 50 | Design | Tap plug | Refractory and plug interface |
| 51 | Design | Tap plug | Use of cold plug to freeze slag |
| 52 | Design | Thermal Oxidizer | Flame arrestor |
| 53 | Design | Thermal Oxidizer | Water wash of flame arrestor |
| 54 | Design | Torch | Nontransferred and transferred torch impacts |
| 55 | Design | Torch | Torch gas impacts |
| 56 | Design | Torch | Torch manipulation uses on floor, process, mixing |

CONFIDENTIAL RESTRICTED ACCESS

PEAT 163649

Trade Secrets shown, discussed, or provided to VRI

| | Group | Area | Element |
|---|---|---|---|
| 57 | Design | Torch | Torch sizings |
| 58 | Design | Waterseal | Use as high temperature heat-up valve |
| 59 | Design | Waterseal | Use as high temperature pressure limiter |
| 60 | Design | Waterseal | Use as high temperature pressure relief |
| 61 | Design | Waterseal | Use of water to maintain level |
| 62 | Equipment selection | Feed system | Feed liquid alternatives |
| 63 | Equipment Selection | Feed system | Feed solid alternatives |
| 64 | Equipment selection | General | Analytical equipment ranges |
| 65 | Equipment selection | General | Analytical equipment types |
| 66 | Equipment selection | General | Use of venturi to measure gas flow & what not to use |
| 67 | Equipment selection | Scrubber | Draft fan selection |
| 68 | Equipment selection | Scrubber | Particulate removal method |
| 69 | Operation/Process | Chamber | Cool down schedule and methods |
| 70 | Operation/Process | Chamber | Heat-up schedules |
| 71 | Operation/Process | Chamber | Oxidant rates per waste type |
| 72 | Operation/Process | Chamber | Pressure monitoring method |
| 73 | Operation/Process | Chamber | Standby by temperatures |
| 74 | Operation/Process | Controls | Feed rates |
| 75 | Operation/Process | Controls | Gas composition determination |
| 76 | Operation/Process | Controls | Negative pressure control ranges |
| 77 | Operation/Process | Controls | Pressure data analysis & range |
| 78 | Operation/Process | Controls | Temperature data analysis |
| 79 | Operation/Process | Controls | Temperature processing |
| 80 | Operation/Process | Feed system | Dusting impacts |
| 81 | Operation/Process | General | PEAT test data for permit |
| 82 | Operation/Process | General | PEAT test data impacts |
| 83 | Operation/Process | General | PEAT test data understanding |
| 84 | Operation/Process | General | Test reports not commonly sent to customers |
| 85 | Operation/Process | Operations | Operations costs |
| 86 | Operation/Process | Operations | Operations flux materials |
| 87 | Operation/Process | Operations | Operations materials |
| 88 | Operation/Process | Operations | Operations personnel requirements |
| 89 | Operation/Process | Operations | Operations seed materials |
| 90 | Operation/Process | Operations | Sampling locations |
| 91 | Operation/Process | Operations | Sampling methods using correct equipment |
| 92 | Operation/Process | Operations | System capabilities to process various materials |
| 93 | Operation/Process | Operations | Training for operation of all systems |
| 94 | Operation/Process | Process | Gas compositions ratios control process |
| 95 | Operation/Process | Process | Setpoints for control parameters |
| 96 | Operation/Process | Scrubber | Heat exchanger flushing |
| 97 | Operation/Process | Scrubber | Rapid quench of gases |
| 98 | Operation/Process | Thermal Oxidizer | T/O operation with highly variable gas comp & flow |
| 99 | Operation/Process | Torch | Nontransfer torch operation |
| 100 | Operation/Process | WWTS | Cleaning water and reuse |
| 101 | Operation/Process | WWTS | Filter cake reprocessing |
| 102 | Operation/Process | WWTS | Floculant selection |
| 103 | Operation/Process | WWTS | Metals removal |
| 104 | Operation/Process | WWTS | Particulate removal |
| 105 | Safety | Safety | Flame arrestor Uses |
| 106 | Safety | Safety | Nitrogen blanket usage |
| 107 | Safety | Safety | Nitrogen emergency usage |
| 108 | Safety | Safety | Nitrogen purge at Tap |
| 109 | Safety | Safety | Water Seal safety uses |

CONFIDENTIAL RESTRICTED ACCESS

PEAT 163650

# Trade Secrets Provided to VRI - Recap

### Chamber Design

Chamber design trade secretes include configuration, Mix chamber, Oxidant, refractory and torch impacts. Chamber configuration trade secrets include the size and shape of both rectangular and cylindrical chambers, instrumentation locations, and entrance and exit locations for the various chamber penetrations when used to process a mixture of organic and non-organic waste materials in a reducing atmosphere to produce a syn-gas. Another trade secret is the design and theory for the use of a Mix chamber to improve efficiency and solve problems associated with temperature maintenance, hot gas mixing turbulence, duration, and hot gas quality. Use of oxidant addition locations to stabilize chemical reactions in the processing chamber, the impact to the process for various types of oxidants, and fine tune the process from the mix chamber oxidant Input locations is another trade secret. PEAT has conducted numerous tests of various refractory materials and families of materials to determine best type or family of materials to be used in reducing atmospheres with chlorine and other chemical present in the waste stream. Some refractory vendors have even told us that we have tested more refractory under these conditions than they have tested. The theory behind the torch and chamber location and movability relationships to impart maximum turbulence, maximum feed and tapping flexibility, and minimal chamber wall thermal effects is another trade secret.

CONFIDENTIAL RESTRICTED ACCESS

/////PEAT, inc. PROPRIETARY INFORMATION/////

## Trade Secrets

1) Refractory selection, based on environment temperatures, chemical compositions, etc. obtained from testing.
2) Tapping system, it took PEAT many years to find the correct method for tapping.
3) Hot pipe refractory selection based on projected and sampled gas composition.
4) Hot pipe temperature range, so reformation of complex hydrocarbons will not occur.
5) Rapid quenching methods, so reformation of complex hydrocarbons will not occur.
6) Scrubbing particulate removal methods.
7) Draft fan selection
8) Heat exchanger cleaning methods
9) Scrubbing system piping flushing critical locations and methods
10) Gas analyzer selection based on PEAT's gas composition testing through gas chromatography.
11) Gas volume measurements on the product gas line.

ADD ——> 12) Sampling locations using the correct probe sizes, etc. based on gas flow rates calculated with PEAT's models on different locations in the system.

13) Waste water treatment flocculant selection.

ADD PRICED ——> 14) Process chamber pressure operational ranges.

15) Steam injection rates based on waste types.
16) Nitrogen purging through out system based on PEAT's testing experience.
17) Controlling the process based on gas composition ratios.

PRICE/ ADD —— 18) Set points for all control parameters, draft fans, flame arrestor, etc.

19) Training for operation of the system as a whole.
20) Equipment water cooling (Tap, tap cart, etc.) determined by PEAT's testing experience.
21) Material selection (hastelloy) for hot pipe and hot valve.
22) Flame arrestor orientation, flushing, etc.
23) PEAT's testing data in order to be used to obtain permits.

$ Systems CAPABILTY DATA Process VARIOUS MATLS
- Test REPORTS

CONFIDENTIAL RESTRICTED ACCESS

12/30/99

PEAT 163652

# *PEAT,* INC.

## COMPANY CONFIDENTIAL

01/14/00 10:08 AM
*Marlin D. Springor*

The following is a discussion of process capabilities, and design and manufacturing issues that include proprietary information and trade secrets.

A Trade Secret is: "A formula, process or device used in a business that is not published or divulged, thereby giving an advantage over competition."

Different states have legal definitions of "Trade Secrets". We need to compile a list to verify which ones meet the Alabama Trade Secret test.

### TRANSFER OF "TRADE SECRETS" FROM PEAT TO VRI

Since 1992, after signing the first "Marketing Agreement" with VRI, PEAT personnel have continually shared many trade secrets with VRI. We always assumed that they would function only as a marketing arm and possibly in the role of operations and maintenance of systems they placed in the field. Trade secrets associated with PEAT's TDR/PEPS technology were not submitted to Vanguard as a definitive list, instead, they were shared with Vanguard since 1992 in continual open discussions, written responses to questions, editorial comments to proposals, and training sessions for Vanguard personnel.

There were certain mathematical process models which PEAT developed, and uses to calculate design specifications, that were not in their entirety released to Vanguard, but through relentless requests for model projection and results, Vanguard engineers were eventually able to determine many of the critical issues that have to be addressed during design specification activities. There were also certain detailed design drawings and engineering calculations, whose possession by Vanguard was not necessary to perform their designated role. The reluctance of PEAT to release this information to Vanguard became a point of contention between the two companies as the PEPS - Phase 1 project evolved. *But involving enough so that the marketing staff could be fully knowledgable in the capability of the system.*

It became clear early in the PEPS Phase 1 Project that Vanguard's intent was to assimilate, not only as many as possible of the trade secrets associated with the integration and operation of the TDR/PEPS technology (their designated role), but also trade secrets associated with the design, manufacturing and procurement of key equipment and major subsystems (PEAT's designated role). It also became evident that Vanguard employees had been instructed to mount a relentless effort toward gathering sufficient trade secret information in order to take over the design, manufacturing, procurement, integration, and operation of future PEPS. Early in the design phase of the PEPS - Phase 1 Vanguard employees Yugi Kado and Jay Ramamurthi began insisting on talking to PEAT's equipment suppliers, and in more than one such conversation told the suppliers that in the future the supplier would be dealing directly with Vanguard rather than with PEAT.

1

C:\MARLIN\AFFILIAT\VRI\DES&MFG.DOC

## COMPANY CONFIDENTIAL

PEAT 163653

# *PEAT*, INC.

## COMPANY CONFIDENTIAL

### GENERAL PROCESS/CAPABILITY KNOWLEDGE

Potential applications (and limitations) of the TDR/PEPS technology for numerous waste types were discussed over the past seven years. Each of these discussions involved not only general technology capabilities and limitations, but discussions of design variations that were necessary to accommodate or optimize the application for specific waste types. The source of this knowledge and basis for considering it a trade secret was the lack of information available in the industry. PEAT had conducted years of Research and Development and many treatability tests of different wastes to gain knowledge that we consider trade secret and proprietary. Specific waste applications discussed with VRI include:

Contaminated Soils
Solid and Liquid Organic Wastes
Small Arms Ammunition
Municipal Waste Incinerator Fly Ash
Hazardous Waste Incinerator Ash
Wastes with Hazardous Metals
Thermal Batteries
Controlled Substances (Cocaine and Marijuana)
DOE Weapons Components with Small Imbedded Explosives
Microbiological Agents
Medical Waste
Pyrotechnic Ordnance
Smoke and Dye Ordnance
Riot Control Chemical Agent
TNT Manufacturing Sludge (Red Water)
Low-level Radioactive Waste surrogates (Cerium, Cesium and Cobalt)
Waste Paint
Chlorinated Solvents
Lab Packs

### DESIGN & MANUFACTURING

While some subsystems (Processing-Chamber and Controls) are always designed and manufactured internally by PEAT, other components can be procured from outside vendors on a more cost effective and/or timely basis. The plasma heating system is always procured from outside vendors because of its developmental complexity and patent protection. For each TDR system built, a build-or-buy decision is made for other major subsystems.

Just because PEAT decides to procure subsystems from outside vendors does not mean that the system is not unique to PEAT's TDR technology. Indeed, if a decision is made to

2

C:\MARLIN\AFFILIAT\VRI\DES&MFG.DOC

## COMPANY CONFIDENTIAL

PEAT 163654

# *PEAT, INC.*

## COMPANY CONFIDENTIAL

procure a subsystem from an outside vendor, PEAT supplies unique detailed specifications to the vendor to which they design and build the procured item. PEAT engineers work very closely with the vendor to insure that the final system performs as designed, and works in concert with the other components, to achieve the overall process goals. PEAT has spent years evaluating technology/vendor capabilities and in developing good professional relationships with the best qualified companies, ~~the~~ knowledge of different vendor capabilities to meet TDR specifications is considered a trade secret. PEAT requires that each technology vendor with which information is exchanged, sign non-disclosure agreements to protect PEAT's proprietary and trade secret information.

### Subsystems Manufactured In-House By PEAT

The processing chamber and control system is highly proprietary and the detail design of both are considered trade secret.

Process Chamber. The process chamber design is unique to the *TDR/PEPS* technology. The overall dimensions and geometry may vary depending on system size and type of waste processed. There are numerous unique aspects of the chamber that are considered trade secret. Examples are:

Refractory selection based on PEAT's research, development and test experience. Each waste type requires specific refractory materials matched to the temperature and chemistry.

Interior geometry to minimize refractory wear from torch plume while providing proper heat distribution to melt pool, tap area, and gas.

Gas residence time to insure total destruction of organic compounds and reformation of process gases.

Shape and configuration of molten pool basin to contain molten metal/glass at proper depth to insure evacuation of material during tapping.

Tapping of molten material from chamber. Controlling the flow of molten glass and metal from the process chamber.

Monitoring temperatures and pressure within the process chamber. Location and refractory penetration depth of thermocouple wells and pressure sensors to accurately reflect processing environment.

# *PEAT, INC.*

## COMPANY CONFIDENTIAL

<u>Configuration and materials of mixing chamber.</u> As an extension of the primary chamber, the mixing chamber has ports to inject and baffles to mix oxidants with the exiting gas to convert entrained carbon to a gas, and to aid in controlling gas temperature.

<u>Configuration and materials of hot pipe.</u> The hot pipe insures that the gases exiting the mixing chamber are maintained at certain temperatures to minimize reformation of pollutants. The hot pipe insulating and refractory properties are calculated to maintain gases in the desired range.

<u>System Controls.</u> The control system is the embodiment of the TDR process. Control of the process is achieved through a central computer, with programmable logic controllers, instrumentation and control loops situated to control requisite process variables. The actual control code is written with development software, designed specifically for industrial processes. The control code is resident on a central computer, with one or more display screens providing system and process information, and operator interaction. Important process data is also collected and stored with the central control computer system. Out-of-tolerance corrections, alarms, or shut-down decisions are all achieved with the control logic, and includes substantial trade secret information related to system capabilities and performance for treatment of a wide variety of waste types at variable high temperature. Examples of unique control requirements are:

<u>Control of plasma heating system.</u> The plasma heating system provides the heat energy that drives the waste destruction process of the TDR. Not only must the torch be properly sized, but control over its power output must be constantly monitored and adjusted if necessary, based on temperatures of gas and vessel refractories at various locations. Control of torch orientation, penetration, power levels, and plasma gas flows are required to control energy levels and dispersal in the vessel for correct gas heating, and uniform melting of inorganic materials. Control over the interaction of a plasma torch, providing plasma gases heated to approximately 18,000 degrees F, with a combined melting and gasification process involves numerous trade secrets.

<u>Control of feed system</u> A controlled rate of feed is crucial for keeping the system balanced and operating at high efficiency. The ability to continuously feed waste material into a processing chamber held at negative pressure and heated to approximately 3000 degrees F, while containing fugitive emissions from the loading and feeding process, and isolating the feed chambers from the potentially explosive gases in the processing chamber, includes trade secrets learned from years of research, development and treatability testing with the TDR pilot system. Control of the feed system must be able to respond to waste types that are highly variable in content and form.

CONFIDENTIAL RESTRICTED ACCESS

4

PEAT 163656

C:\MARLIN\AFFILIAT\VRNDES&MFG.DOC

## COMPANY CONFIDENTIAL

# *PEAT*, INC.

## COMPANY CONFIDENTIAL

Overall process control involves virtually all of the different subsystems and includes:

Control of oxidant supply
Control of gas scrubber system
Maintaining correct vacuum/pressure throughout system
Control of thermal oxidizer
Safety issues
Emergency responses

### Subsystems Procured from Outside Vendors

The plasma heating system is always procured from outside vendors. A dependable plasma heating system requires years of research and development, and the best systems are patent protected. There are at least five vendors of plasma heating systems in the US. Most plasma heating systems are used in melting technologies (metal smelting and vitrification). PEAT has more experience in using plasma torches for organic gasification applications than any other US company.

**Plasma Heating System.** The plasma heating system is one of the more specialized subsystems in a TDR design. PEAT does not manufacture a plasma heating system, but it fully understands the capabilities and limitations of the various industrial torch designs, and selects the best supplier to insure that the proper torch is procured for each specific application. Trade secrets involved in developing specifications, vendor selection, procurement, integration, and operation of the plasma heating system include:

Proper Torch Type. There are approximately five different plasma torch types, each of which has unique properties that influence the treatment of different hazardous wastes, the configuration of the processing vessel.

Proper Torch Size. PEAT has developed a mathematical model of the TDR process which predicts the proper plasma torch size in kilowatts to match the processing vessel and desired throughput of waste.

Torch Articulation Requirements. Depending on the torch type and type of waste being processed, some articulation of the torch is required.

Torch (Plasma) Gas Requirements. Plasma torches of different design can operate on different gases. The gases also have a big impact on the chemical process. Matching the plasma gas with the TDR system and process is unique.

5

C:\MARLIN\AFFILIAT\VR\DES&MFG.DOC

## COMPANY CONFIDENTIAL

PEAT 163657

# *PEAT,* INC.

## COMPANY CONFIDENTIAL

<u>Other Subsystems - "Build or Buy"</u>

<u>Feed System.</u> PEAT may procure a feed system from outside vendors if the required system is sufficiently complex or protected by patents. Simpler feed systems are usually built in-house. Controlled feeding and blending of different wastes, oxidants and glass forming fluxes are very unique and considered trade secret. Performance specifications and design issues involved in procuring/building a feed system include:

<u>Variable speed - continuous feed</u>. Control over the feed rates, and blending of different wastes, oxidants and fluxes.

<u>Feed system operation under differential pressure.</u> Maintaining appropriate gas seals and positive pressure in feed chamber, with controlled feed rates into a vessel held under negative pressure.

<u>Prevention of explosive gas buildup in feed chambers.</u> Preventive measures and emergency procedures associated with preventing potentially explosive gases in the process chamber from entering the feed chamber.

<u>Gas Treatment System (Scrubber).</u> The gases evolving from the TDR/PEPS processing of different waste types are distinctly different from typical thermal treatment processes (incineration). PEAT has, through R&D, and treatability testing of different wastes, developed data bases and mathematical models of the process that support specifications of gas scrubbers for many different wastes. While these models were never released to VRI, the design discussions of gas treatment technologies, and model calculation summaries gave them significant insight into the issues and trade secrets involved in gas scrubber applications to the process.

A company designing, or writing specifications for a gas scrubbing system must have detailed knowledge of, and the ability to predict the range of the following variables:

<u>Inlet gas temperatures.</u> Temperatures of gases from the plasma heated chamber are much higher than from typical incinerators, and can fluctuate dramatically.

<u>Inlet gas composition.</u> Prediction and knowledge of gas composition from the pyrolysis of organic wastes at different temperatures is important to the design of the scrubber.

<u>Inlet gas flow rates.</u> Gas flow from the TDR process is much lower than typical incineration, and highly variable depending on the waste being processed and its homogeneity. The gas flow is a combination of torch gas, waste decomposition, and steam or other oxidant injection. Gas flow rates are very crucial to scrubber efficiency.

<u>Acid gas volume in inlet gas.</u> Formation of acid gases from the TDR pyrolysis process is different from oxygen rich combustion.

6

C:\MARLIN\AFFILIAT\VRRDES&MFG.DOC

## COMPANY CONFIDENTIAL

PEAT 163658

CONFIDENTIAL RESTRICTED ACCESS

# *PEAT, INC.*

## COMPANY CONFIDENTIAL

<u>Particulate load of inlet gas.</u> Particulate loading of the product gas is highly variable depending on waste type, oxidant of choice, and other control variables. Knowledge of and the ability to control this variable is highly proprietary.

<u>Safety issues associated with combustible/explosive gases.</u> The gases produced from the TDR process are by nature potentially explosive and combustible, and flow throughout the gas scrubbing system. Safe handling of these gases in various scrubber designs has come from years of R&D and testing.

CONFIDENTIAL RESTRICTED ACCESS

7

C:\MARLIN\AFFILIAT\VRNDES&MFG.DOC

COMPANY CONFIDENTIAL

PEAT 163659

# *PEAT*, INC.

## COMPANY CONFIDENTIAL

01/14/00 3:10 PM
*Martin D. Springer*

The following is a discussion of <u>process capabilities,</u> and <u>design and manufacturing</u> issues that include proprietary information and trade secrets provided to Vanguard by PEAT since 1992.

*CONFIDENTIAL RESTRICTED ACCESS*

### TRANSFER OF "TRADE SECRETS" FROM PEAT TO VRI

Since 1992, after signing the first "Marketing Agreement" with VRI, PEAT personnel have continually shared many trade secrets with VRI. We always assumed that they would function only as a marketing arm and possibly in the role of operations and maintenance of systems they placed in the field. Trade secrets associated with PEAT's TDR/PEPS technology were not submitted to Vanguard as a definitive list, instead, they were shared with Vanguard since 1992 in continual open discussions, written responses to questions, editorial comments to proposals, and training sessions for Vanguard personnel.

There were certain mathematical process models which PEAT developed, and uses to calculate design specifications, that were not in their entirety released to Vanguard, but through relentless requests for model projection and results, Vanguard engineers were eventually able to determine many of the critical issues that have to be addressed during design specification activities. There were also certain detailed design drawings and engineering calculations, whose possession by Vanguard was not necessary to perform their designated role. They insisted on this level of detail in order to be "good salesmen". The reluctance of PEAT to release this information to Vanguard became a point of contention between the two companies as the PEPS - Phase 1 project evolved.

It became clear early in the PEPS Phase 1 Project that Vanguard's intent was to assimilate, not only as many as possible of the trade secrets associated with the integration and operation of the TDR/PEPS technology (their designated role), but also trade secrets associated with the design, manufacturing and procurement of key equipment and major subsystems (PEAT's designated role). It also became evident that Vanguard employees had been instructed to mount a relentless effort toward gathering sufficient trade secret information in order to take over the design, manufacturing, procurement, integration, and operation of future PEPS. Early in the design phase of the PEPS - Phase 1 Vanguard employees Yugi Kado and Jay Ramamurthi began insisting on talking to PEAT's equipment suppliers, and in more than one such conversation told the suppliers that in the future the supplier would be dealing directly with Vanguard rather than with PEAT.

1

C:\MARLIN\AFFILIAT\VRI\TRD-SEC2.DOC

PEAT 163660

# PEAT, INC.

## COMPANY CONFIDENTIAL

### GENERAL PROCESS/CAPABILITY KNOWLEDGE

Potential applications (and limitations) of the TDR/PEPS technology for numerous waste types were discussed over the past seven years. Each of these discussions involved not only general technology capabilities and limitations, but discussions of design variations that were necessary to accommodate or optimize the application for specific waste types. The source of this knowledge and basis for considering it a trade secret was the lack of information available in the industry. PEAT had conducted years of Research and Development and many treatability tests of different wastes to gain knowledge that we consider trade secret and proprietary. Specific waste applications discussed with VRI include:

Contaminated Soils
Solid and Liquid Organic Wastes
Small Arms Ammunition
Municipal Waste Incinerator Fly Ash
Hazardous Waste Incinerator Ash
Wastes with Hazardous Metals
Thermal Batteries
Controlled Substances (Cocaine and Marijuana)
DOE Weapons Components with Small Imbedded Explosives
Microbiological Agents
Medical Waste
Pyrotechnic Ordnance
Smoke and Dye Ordnance
Riot Control Chemical Agent
TNT Manufacturing Sludge (Red Water)
Low-level Radioactive Waste surrogates (Cerium, Cesium and Cobalt)
Waste Paint
Chlorinated Solvents
Lab Packs

CONFIDENTIAL RESTRICTED ACCESS

PEAT also generated a substantial amount of third-party test data associated with processing different wastes These test data are valuable in permitting activities when siting a unit at a specific location. Some of the test data has been used by PEAT to get permits at different locations, and in doing so, summaries of the test information have become available to the public. (Supporting detailed test data are not released to the public, and are considered proprietary information.)

Rarely, if ever, will actual test data be used in a permit application. There will almost always be differences between the unit used for testing, and the one for which a permit is sought, requiring that adjustments in test data be made for differences in: waste

2

C:\MARLIN\AFFILIAT\VRI\TRD-SEC2.DOC

PEAT 163661

# *PEAT, INC.*
## COMPANY CONFIDENTIAL

composition, feed rates, oxidant use, system size, and vessel or scrubber design, among others. Making these adjustments requires detailed understanding of the system and process. PEAT engineers were asked to "assist" VRI throughout the permitting process in Virginia, and in doing so transferred trade secret information.

The collection of gas samples from the system involves unique methods. The gas flows and temperatures in the system are sufficiently different from those in combustion systems that PEAT has had to work very closely with sampling companies before they can collect samples that will meet EPA requirements. PEAT assisted VRI and a Virginia sampling company in collecting samples in Virginia and in doing so transferred trade secret information.

### DESIGN & MANUFACTURING

CONFIDENTIAL RESTRICTED ACCESS

While some subsystems (Processing Chamber and Controls) are always designed and manufactured internally by PEAT, other components can be procured from outside vendors on a more cost effective and/or timely basis. The plasma heating system is always procured from outside vendors because of its developmental complexity and patent protection. For each TDR system built, a build-or-buy decision is made for other major subsystems.

Just because PEAT decides to procure subsystems from outside vendors does not mean that the system is not unique to PEAT's TDR technology. Indeed, if a decision is made to procure a subsystem from an outside vendor, PEAT supplies unique detailed specifications to the vendor to which they design and build the procured item. PEAT engineers work very closely with the vendor to insure that the final system performs as designed, and works in concert with the other components, to achieve the overall process goals. PEAT has spent years evaluating technology/vendor capabilities and in developing good professional relationships with the best qualified companies. The knowledge of vendor capabilities and in technology variations to meet TDR specifications is considered a trade secret. PEAT requires that each technology vendor with which information is exchanged, sign non-disclosure agreements to protect PEAT's proprietary and trade secret information.

### Subsystems Manufactured In-House By PEAT

The processing chamber and control system is highly proprietary and the detail design of both are considered trade secret.

3

C:\MARLIN\AFFILIAT\VRI\TRD-SEC2.DOC

## COMPANY CONFIDENTIAL

PEAT 163662

# *PEAT*, *INC.*

## COMPANY CONFIDENTIAL

Process Chamber. The process chamber design is unique to the TDR/PEPS technology. The overall dimensions and geometry may vary depending on system size and type of waste processed. There are numerous unique aspects of the chamber that are considered trade secret. Examples are:

Refractory selection based on PEAT's research, development and test experience. Each waste type requires specific refractory materials matched to the temperature and chemistry.

Interior geometry to minimize refractory wear from torch plume while providing proper heat distribution to melt pool, tap area, and gas.

Gas residence time to insure total destruction of organic compounds and reformation of process gases.

Shape and configuration of molten pool basin to contain molten metal/glass at proper depth to insure evacuation of material during tapping.

Tapping of molten material from chamber. Controlling the flow of molten glass and metal from the process chamber.

Monitoring temperatures and pressure within the process chamber. Location and refractory penetration depth of thermocouple wells and pressure sensors to accurately reflect processing environment.

Configuration and materials of mixing chamber As an extension of the primary chamber, the mixing chamber has ports to inject and baffles to mix oxidants with the exiting gas to convert entrained carbon to a gas, and to aid in controlling gas temperature.

Configuration and materials of hot pipe. The hot pipe insures that the gases exiting the mixing chamber are maintained at certain temperatures to minimize reformation of pollutants. The hot pipe insulating and refractory properties are calculated to maintain gases in the desired range.

System Controls. The control system is the embodiment of the TDR process. Control of the process is achieved through a central computer, with programmable logic controllers, instrumentation and control loops situated to control requisite process variables. The actual control code is written with development software, designed specifically for industrial processes. The control code is resident on a central computer, with one or more display screens providing system and process information, and operator interaction. Important process data is also collected and stored with the central control

4

C:\MARLIN\AFFILIATIVRNTRD-SEC2.DOC

## COMPANY CONFIDENTIAL

PEAT 163663

# PEAT, INC.

## COMPANY CONFIDENTIAL

computer system. Out-of-tolerance corrections, alarms, or shut-down decisions are all achieved with the control logic, and includes substantial trade secret information related to system capabilities and performance for treatment of a wide variety of waste types at variable high temperature. Examples of unique control requirements are:

Control of plasma heating system. The plasma heating system provides the heat energy that drives the waste destruction process of the TDR. Not only must the torch be properly sized, but control over its power output must be constantly monitored and adjusted if necessary, based on temperatures of gas and vessel refractories at various locations. Control of torch orientation, penetration, power levels, and plasma gas flows are required to control energy levels and dispersal in the vessel for correct gas heating, and uniform melting of inorganic materials. Control over the interaction of a plasma torch, providing plasma gases heated to approximately 18,000 degrees F, with a combined melting and gasification process involves numerous trade secrets.

Control of feed system A controlled rate of feed is crucial for keeping the system balanced and operating at high efficiency. The ability to continuously feed waste material into a processing chamber held at negative pressure and heated to approximately 3000 degrees F, while containing fugitive emissions from the loading and feeding process, and isolating the feed chambers from the potentially explosive gases in the processing chamber, includes trade secrets learned from years of research, development and treatability testing with the TDR pilot system. Control of the feed system must be able to respond to waste types that are highly variable in content and form.

Overall process control involves virtually all of the different subsystems and includes:

Control of oxidant supply
Control of gas scrubber system
Maintaining correct vacuum/pressure throughout system
Control of thermal oxidizer
Safety issues
Emergency responses

CONFIDENTIAL RESTRICTED ACCESS

Subsystems Procured from Outside Vendors

The plasma heating system is always procured from outside vendors. A dependable plasma heating system requires years of research and development, and the best systems are patent protected. There are at least five vendors of plasma heating systems in the US. Most plasma heating systems are used in melting technologies (metal smelting and vitrification). PEAT has more experience in using plasma torches for organic gasification applications than any other US company.

5

C:\MARLIN\AFFILIATIVRITRD-SEC2.DOC

## COMPANY CONFIDENTIAL

PEAT 163664

# *PEAT, INC.*

## COMPANY CONFIDENTIAL

procure a subsystem from an outside vendor, PEAT supplies unique detailed specifications to the vendor to which they design and build the procured item. PEAT engineers work very closely with the vendor to insure that the final system performs as designed, and works in concert with the other components, to achieve the overall process goals. PEAT has spent years evaluating technology/vendor capabilities and in developing good professional relationships with the best qualified companies, and the knowledge of different vendor capabilities to meet TDR specifications is considered a trade secret. PEAT requires that each technology vendor with which information is exchanged, sign non-disclosure agreements to protect PEAT's proprietary and trade secret information.

### Subsystems Manufactured In-House By PEAT

The processing chamber and control system is highly proprietary and the detail design of both are considered trade secret.

Process Chamber. The process chamber design is unique to the TDR/PEPS technology. The overall dimensions and geometry may vary depending on system size and type of waste processed. There are numerous unique aspects of the chamber that are considered trade secret. Examples are:

Refractory selection based on PEAT's research, development and test experience. Each waste type requires specific refractory materials matched to the temperature and chemistry.

Interior geometry to minimize refractory wear from torch plume while providing proper heat distribution to melt pool, tap area, and gas.

Gas residence time to insure total destruction of organic compounds and reformation of process gases.

Shape and configuration of molten pool basin to contain molten metal/glass at proper depth to insure evacuation of material during tapping.

Tapping of molten material from chamber. Controlling the flow of molten glass and metal from the process chamber.

Monitoring temperatures and pressure within the process chamber. Location and refractory penetration depth of thermocouple wells and pressure sensors to accurately reflect processing environment.

CONFIDENTIAL RESTRICTED ACCESS

# PEAT, INC.
## COMPANY CONFIDENTIAL

<u>Prevention of explosive gas buildup in feed chambers.</u> Preventive measures and emergency procedures associated with preventing potentially explosive gases in the process chamber from entering the feed chamber.

<u>Gas Treatment System (Scrubber).</u> The gases evolving from the TDR/PEPS processing of different waste types are distinctly different from typical thermal treatment processes (incineration). PEAT has, through R&D, and treatability testing of different wastes, developed data bases and mathematical models of the process that support specifications of gas scrubbers for many different wastes. While these models were never released to VRI, the design discussions of gas treatment technologies, and model calculation summaries gave them significant insight into the issues and trade secrets involved in gas scrubber applications to the process.

A company designing, or writing specifications for a gas scrubbing system must have detailed knowledge of, and the ability to predict the range of the following variables:

<u>Inlet gas temperatures.</u> Temperatures of gases from the plasma heated chamber are much higher than from typical incinerators, and can fluctuate dramatically.

<u>Inlet gas composition.</u> Prediction and knowledge of gas composition from the pyrolysis of organic wastes at different temperatures is important to the design of the scrubber.

<u>Inlet gas flow rates.</u> Gas flow from the TDR process is much lower than typical incineration, and highly variable depending on the waste being processed and its homogeneity. The gas flow is a combination of torch gas, waste decomposition, and steam or other oxidant injection. Gas flow rates are very crucial to scrubber efficiency.

<u>Acid gas volume in inlet gas.</u> Formation of acid gases from the TDR pyrolysis process is different from oxygen rich combustion.

<u>Particulate load of inlet gas.</u> Particulate loading of the product gas is highly variable depending on waste type, oxidant of choice, and other control variables. Knowledge of and the ability to control this variable is highly proprietary.

<u>Safety issues associated with combustible/explosive gases.</u> The gases produced from the TDR process are by nature potentially explosive and combustible, and flow throughout the gas scrubbing system. Safe handling of these gases in various scrubber designs has come from years of R&D and testing.

CONFIDENTIAL RESTRICTED ACCESS

C:\MARLIN\AFFILIATI\VRI\TRD-SEC2.DOC

**COMPANY CONFIDENTIAL** PEAT 163666

# *PEAT*, inc.
## COMPANY CONFIDENTIAL

ENGINEER'S LIST OF ISSUES CONSIDERED TO BE EITHER
COMPANY PROPRIETARY
OR
"TRADE SECRETS"

CONFIDENTIAL RESTRICTED ACCESS

## COMPANY CONFIDENTIAL

PEAT 163667

Trade Secrets shown, discussed, or provided to VRI

| | Group | Area | Element |
|---|---|---|---|
| 1 | Design | Chamber | Configuration of interior |
| 2 | Design | Chamber | Entrance locations |
| 3 | Design | Chamber | Exit locations |
| 4 | Design | Chamber | Heat capacities |
| 5 | Design | Chamber | Instrumentation locations |
| 6 | Design | Chamber | Mix chamber theory and design |
| 7 | Design | Chamber | Oxidant addition |
| 8 | Design | Chamber | Oxidant addition locations |
| 9 | Design | Chamber | Refractory actual test data |
| 10 | Design | Chamber | Refractory chemical compositions |
| 11 | Design | Chamber | Refractory environmental temperatures |
| 12 | Design | Chamber | Refractory use families |
| 13 | Design | Chamber | Torch impacts |
| 14 | Design | Chamber | Water cooling impacts |
| 15 | Design | Controls | Negative pressure impacts |
| 16 | Design | Controls | Oxidant impacts |
| 17 | Design | Cooling system | Function and location of PEAT cooling system |
| 18 | Design | Cooling system | Heat loading of systems |
| 19 | Design | Cooling system | Impact of torch system |
| 20 | Design | Cooling system | Torch cooling system |
| 21 | Design | Feed system | Continuous vs. batch impacts |
| 22 | Design | Feed system | Feed liquid locations |
| 23 | Design | Feed system | Feed liquid method |
| 24 | Design | Feed system | Feed materials impacts and characteristics |
| 25 | Design | Feed system | Feed solid methods |
| 26 | Design | Feed system | preprocessing impacts |
| 27 | Design | General | Gas flow measuring & volume calculations |
| 28 | Design | General | Gases to sample for |
| 29 | Design | General | Nitrogen locations - experience determination |
| 30 | Design | General | Sub-system relationships and impacts |
| 31 | Design | Hot pipe | Hot pipe refractory type |
| 32 | Design | Hot pipe | Use to transport gasses maintain hot and heat dissipation |
| 33 | Design | Operations | Pre-heat system function, calibration, standby, condition |
| 34 | Design | Operations | Preheat system configuration |
| 35 | Design | Operations | Sampling gases location |
| 36 | Design | Scrubber | Alternative methods for rapid quench of gases |
| 37 | Design | Scrubber | Bag house constraints |
| 38 | Design | Scrubber | Bag house pitfalls |
| 39 | Design | Scrubber | Bag house use safeties |
| 40 | Design | Scrubber | Bag house uses - and remedies if required to use |
| 41 | Design | Scrubber | High temperature filter constraints] |
| 42 | Design | Scrubber | High temperature filter uses |
| 43 | Design | Scrubber | Scrubber system flushing points |
| 44 | Design | Scrubber | Scrubber system variables |
| 45 | Design | Scrubber | Slow quench problems and issues and critical temperatures |
| 46 | Design | Tap | Tap into cooled cart system |
| 47 | Design | Tap | Tap into water system |
| 48 | Design | Tap plug | Don't use electrical, gas, lift, mechanical and others |
| 49 | Design | Tap plug | End configuration |
| 50 | Design | Tap plug | Refractory and plug interface |
| 51 | Design | Tap plug | Use of cold plug to freeze slag |
| 52 | Design | Thermal Oxidizer | Flame arrestor |
| 53 | Design | Thermal Oxidizer | Water wash of flame arrestor |
| 54 | Design | Torch | Nontransfered and transferred torch impacts |
| 55 | Design | Torch | Torch gas impacts |
| 56 | Design | Torch | Torch manipulation uses on floor, process, mixing |

PEAT 163868

CONFIDENTIAL/RESTRICTED ACCESS

| | Group | Area | Element |
|---|---|---|---|
| 57 | Design | Torch | Torch sizings |
| 58 | Design | Waterseal | Use as high temperature heat-up valve |
| 59 | Design | Waterseal | Use as high temperature pressure limiter |
| 60 | Design | Waterseal | Use as high temperature pressure relief |
| 61 | Design | Waterseal | Use of water to maintain level |
| 62 | Equipment selection | Feed system | Feed liquid alternatives |
| 63 | Equipment Selection | Feed system | Feed solid alternatives |
| 64 | Equipment selection | General | Analytical equipment ranges |
| 65 | Equipment selection | General | Analytical equipment types |
| 66 | Equipment selection | General | Use of venturi to measure gas flow & what not to use |
| 67 | Equipment selection | Scrubber | Draft fan selection |
| 68 | Equipment selection | Scrubber | Particulate removal method |
| 69 | Operation/Process | Chamber | Cool down schedule and methods |
| 70 | Operation/Process | Chamber | Heat-up schedules |
| 71 | Operation/Process | Chamber | Oxidant rates per waste type |
| 72 | Operation/Process | Chamber | Pressure monitoring method |
| 73 | Operation/Process | Chamber | Standby by temperatures |
| 74 | Operation/Process | Controls | Feed rates |
| 75 | Operation/Process | Controls | Gas composition determination |
| 76 | Operation/Process | Controls | Negative pressure control ranges |
| 77 | Operation/Process | Controls | Pressure data analysis & range |
| 78 | Operation/Process | Controls | Temperature data analysis |
| 79 | Operation/Process | Controls | Temperature processing |
| 80 | Operation/Process | Feed system | Dusting impacts |
| 81 | Operation/Process | General | PEAT test data for permit |
| 82 | Operation/Process | General | PEAT test data impacts |
| 83 | Operation/Process | General | PEAT test data understanding |
| 84 | Operation/Process | General | Test reports not commonly sent to customers |
| 85 | Operation/Process | Operations | Operations costs |
| 86 | Operation/Process | Operations | Operations flux materials |
| 87 | Operation/Process | Operations | Operations materials |
| 88 | Operation/Process | Operations | Operations personnel requirements |
| 89 | Operation/Process | Operations | Operations seed materials |
| 90 | Operation/Process | Operations | Sampling locations |
| 91 | Operation/Process | Operations | Sampling methods using correct equipment |
| 92 | Operation/Process | Operations | System capabilities to process various materials |
| 93 | Operation/Process | Operations | Training for operation of all systems |
| 94 | Operation/Process | Process | Gas compositions ratios control process |
| 95 | Operation/Process | Process | Setpoints for control parameters |
| 96 | Operation/Process | Scrubber | Heat exchanger flushing |
| 97 | Operation/Process | Scrubber | Rapid quench of gases |
| 98 | Operation/Process | Thermal Oxidizer | T/O operation with highly variable gas comp & flow |
| 99 | Operation/Process | Torch | Nontransfer torch operation |
| 100 | Operation/Process | WWTS | Cleaning water and reuse |
| 101 | Operation/Process | WWTS | Filter cake reprocessing |
| 102 | Operation/Process | WWTS | Floculant selection |
| 103 | Operation/Process | WWTS | Metals removal |
| 104 | Operation/Process | WWTS | Particulate removal |
| 105 | Safety | Safety | Flame arrestor Uses |
| 106 | Safety | Safety | Nitrogen blanket usage |
| 107 | Safety | Safety | Nitrogen emergency usage |
| 108 | Safety | Safety | Nitrogen purge at Tap |
| 109 | Safety | Safety | Water Seal safety uses |

CONFIDENTIAL RESTRICTED ACCESS

PEAT 163669

US005534659A

# United States Patent [19]

## Springer et al.

| | | |
|---|---|---|
| [11] | Patent Number: | 5,534,659 |
| [45] | Date of Patent: | Jul. 9, 1996 |

[54] APPARATUS AND METHOD FOR TREATING HAZARDOUS WASTE

[75] Inventors: Marlin D. Springer, Huntsville; William C. Burns, Harvest; Thomas Barkley, Ardmore, all of Ala.

[73] Assignee: Plasma Energy Applied Technology Incorporated, Huntsville, Ala.

[21] Appl. No.: 229,016

[22] Filed: Apr. 18, 1994

[51] Int. Cl.⁶ ............................................ A62D 3/00
[52] U.S. Cl. ................... 588/227; 588/205; 588/225; 204/157.15; 204/157.3; 204/158.20; 110/346; 422/186.21; 422/186.23
[58] Field of Search ........................... 588/205, 227, 588/225; 204/157.15, 157.3, 158.2; 110/346; 422/186.21, 186.23

[56] References Cited

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,779,182 | 12/1973 | Camacho | 110/8 |
| 3,841,239 | 10/1974 | Nakamura | |
| 4,181,504 | 1/1980 | Camacho | 48/197 |
| 4,438,706 | 3/1984 | Boday et al. | 110/238 |
| 4,479,443 | 10/1984 | Faldt et al. | 110/346 |
| 4,508,040 | 4/1985 | Santen et al. | 110/347 |
| 4,615,285 | 10/1986 | Bentell | 110/346 |
| 4,644,877 | 2/1987 | Barton | 110/250 |
| 4,770,109 | 9/1988 | Schlienger | 110/247 |
| 4,831,944 | 5/1989 | Durand | 110/346 |
| 4,896,614 | 1/1990 | Kulkarni | 110/346 |

| | | | |
|---|---|---|---|
| 4,980,092 | 12/1990 | Pineau et al. | 252/632 |
| 4,989,522 | 2/1991 | Cline et al. | 110/250 |
| 4,998,486 | 3/1991 | Dighe et al. | 110/346 |
| 5,010,829 | 4/1991 | Kulkarni | 110/346 |
| 5,065,680 | 11/1991 | Cheetham | 110/342 |
| 5,090,340 | 2/1992 | Burgess | 110/346 |
| 5,095,828 | 3/1992 | Holden et al. | 110/250 |
| 5,108,708 | 4/1992 | Dumroradrof | 422/186.3 |
| 5,127,347 | 7/1992 | Cheetham | 110/347 |
| 5,134,946 | 8/1992 | Poovey | 110/346 |
| 5,143,000 | 9/1992 | Camacho | 110/250 |
| 5,280,757 | 1/1994 | Carter et al. | 110/346 |
| 5,319,176 | 6/1994 | Alvi et al. | 219/121.59 |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 0390872 | 6/1989 | European Pat. Off. |

### OTHER PUBLICATIONS

Municipal Solid Waste Feasibility of Gasification with Plasma ARC, Environmental Analyses, presented to EPRI Symposium Industrial Applications of Plasma, Palo Alto, CA, Mar. 7–9, 1990.

Primary Examiner—John Niebling
Assistant Examiner—C. Delacroix-Muirheid
Attorney, Agent, or Firm—Dowell & Dowell

[57] ABSTRACT

An apparatus and method suitable for treating hazardous and non-hazardous waste materials composed of organic and inorganic components is disclosed. The apparatus includes a plasma heating system and off-gas processing which converts the waste to benign solids and useful gas.

39 Claims, 3 Drawing Sheets

CONFIDENTIAL RESTRICTED ACCESS

PEAT 163670

CONFIDENTIAL RESTRICTED ACCESS

Fig-1

*Fig. 2*

*Fig. 3*

CONFIDENTIAL RESTRICTED ACCESS

PEAT 163672

# Fig. 4

CONFIDENTIAL RESTRICTED ACCESS

PEAT 163673

5,534,659

CONFIDENTIAL RESTRICTED ACCESS

PEAT 163674

# APPARATUS AND METHOD FOR TREATING HAZARDOUS WASTE

## BACKGROUND OF THE INVENTION

This invention relates to the controlled thermal destruction of waste material, and, more particularly, to a method and apparatus for the treatment of hazardous and non-hazardous materials contained in a waste stream composed of organic (carbonaceous) and inorganic materials, such that the processed waste contains no residues that would require subsequent treatment or landfill disposal. The process involves high temperature pyrolysis and controlled gasification of organic materials, and metals recovery and/or vitrification of inorganic materials.

Placing medical and other waste in landfills was until recently the accepted method of disposal. When the consequences of landfill disposal were investigated more closely, public opposition and regulatory pressures restricted the landfill practice and forced the industry to instead employ incineration, the only other technology that was economical and seemed to solve the disposal problem. Incineration proved useful where landfill space was unavailable or too expensive, but it also was subjected to public concern. Eventually, new and more stringent air emission regulations became effective which most incinerators could not meet. Furthermore, those incinerators that have remained in operation leave an ash residue that often fails the E.P.A. toxicity characteristic leaching procedure (TCLP) test, and contains recognizable and potentially hazardous unburned materials.

Most existing medical waste incinerators are based on old technologies and were built during the period of 1960–1990, or before the present stricter regulations became effective. The air pollution control systems on the older designs, as well as the design of the incinerators, are inadequate to meet the present standards.

Although incinerators are somewhat effective for reducing the volume of waste by combustion, the basic nature of medical waste creates substantial problems for them. One of the major problems encountered in using incinerators to combust medical wastes is the heterogeneity of the waste material. This problem prevents the incinerators from maintaining a sufficiently high constant temperature to completely destroy all of the organic material in the waste. Pollutants that plague incinerators include the so-called products of incomplete combustion. For example, a first bag of such waste may be filled with containers of fluids, blood soaked bandages, and sharps (syringes, glass, metal surgical tools and the like), while a second bag may contain mostly plastics, paper, packing material, pads, surgical gowns, rubbers gloves, and the like. These two bags, fed independently into an incinerator, would create totally different combustion conditions. The first bag would quench and cool the combustion process, while the second bag would accelerate and raise temperatures.

During the low temperature cycle, products of incomplete combustion and the reformation of potentially hazardous organic materials, such as dioxin and furan, are much more likely. During the high temperature cycle, particulate, nitrogen oxide and metal oxide emissions increase, and particularly hexavalent chromium, a carcinogen. Shredding waste before feeding it into the combustion vessel would homogenize and mix the waste, but it is generally not acceptable because of the potentially infectious nature of the waste and the inherent problem of disinfecting a shredder having numerous internal components and small confined places where infectious material might collect and escape disinfection. Moreover, many states have laws prohibiting opening bags of infectious waste prior to their final processing.

Compounding the problem of temperature control within incinerators is the batch method of feeding that is commonly used. In this method, a ram system is normally used to push a charge of waste into a combustion chamber. Because the incinerator relies on the waste itself for fuel, as the waste combusts, chamber temperatures vary as the amount of combustible waste in the chamber changes. This problem is especially pronounced at start-up and shut-down. Temperatures also vary with changing feed rates and incinerators operate poorly at reduced feed rates.

It is important to achieve high temperatures because the destruction of inorganic waste components commonly found in medical and other waste streams requires them. Only a few incinerator designs can even reach the high temperatures required to melt stainless steel and borosilicate glass used in laboratories, and these incinerators further require fossil fuel additions to supplement the combustion process.

The destruction of organic waste also requires high temperatures, but instead of simply melting at high temperatures, such waste decomposes and burns if sufficient air is present. The combustion process can be self-sustaining only if enough heat energy is released during the process to cause additional material to decompose. This can be a problem in incinerators, however, and especially when wet and inorganic materials are present in the feed. Under such conditions, it is not possible to maintain a high, continuous operating temperature.

Apparatuses that have used plasma torches to improve on the low and varying temperature problem, have only achieved a partial solution. For example, U.S. Pat. No. 5,280,757 to Carter discloses a ram (or batch) feed system, which causes significant variation in gas flow rates and temperatures, and includes no precautionary measures to hold the exit gas temperature at a safe high level at which reformation of more complex organic compounds is minimal. The off-gas piping of Carter is composed of stainless steel and it leads to a steel cyclone for particulate collection.

The present inventors have determined that cooling gas in a six-foot section of stainless steel pipe causes the gas temperature to drop into a sufficiently low range (i.e., into the approximately 350°–500° C. range) to allow significant reformation of organic compounds, and particularly polycyclic aromatic hydrocarbons (PAH's). Carter discloses the presence of significant levels of PAH's in the emissions data in Table I. The present inventors have determined, then, that even when the gas temperature is sufficiently high and constant in the processing chamber to effect complete dissociation of organic materials, the gas must be maintained at a sufficiently high temperature after it leaves the chamber and until it is rapidly cooled, to reduce the likelihood of organic compounds reforming.

In recent years, public and regulatory attention has focused on the problems associated with the disposal of medical waste generated by hospitals, clinics, medical offices and research facilities. Numerous new technologies have emerged which been offered as solutions to these problems. Most of these new technologies employ disinfection and/or sterilization methods to reduce or eliminate the infectious portion of the waste so that it may be placed in a landfill after treatment. Where landfill space is still affordable, rendering the infectious component harmless, and then disposing of the entire waste stream as non-infectious waste

1194

**3**

in a landfill has been offered as a partial solution. As the amount of available landfill continues to decrease, however, and public opposition to using landfills increases, an alternative, final, no-landfill solution becomes inevitable.

Furthermore, all of the disinfection and sterilization technologies leave large amounts of residue or waste to deal with after the process is completed.

Also, many waste treatment processes require a strict sorting practice before selected waste items can be treated. Because most of the non-incineration technologies treat only the infectious portion of the hospital's waste, human error inherent in sorting the waste exposes the hospital to liability claims if infectious waste is later discovered in the non-infectious waste destined for landfills. Substantial fines and potential incarceration for repeat offenders in many states has made this a serious problem.

### SUMMARY OF THE INVENTION

The present invention has been made in view of the above-explained inadequacies of the known waste treating apparatuses and methods and has as an object to provide a waste processing system and a method for processing a wide variety of waste types and compositions, containing non-uniform amounts and distributions of moisture, while complying with all applicable air and water emission standards and producing no residues that require disposal in a landfill.

It is another object of the invention to provide a waste processing system which is capable of treating unsorted waste.

It is another object of the invention to provide a waste processing system which is capable of maintaining a constant high temperature throughout the waste treatment process so as to destroy all complex organic materials and process the off-gas so as to minimize the reformation of complex organic compounds, and melt all inorganic waste material into solid residues which pass EPA TCLP tests and can be recycled or reused.

Additional objects and advantages of the invention will be learned from the detailed description of a preferred embodiment of the invention which follows, and the accompanying drawings, or may be learned by practice of the invention.

To achieve the foregoing objects of the invention, as embodied and broadly described herein, the apparatus for treating waste in accordance with a preferred embodiment of the invention comprises a waste processing chamber. Waste is introduced into the processing chamber at a controlled feed rate, and is heated therein by a plasma arc torch to temperatures up to about 1650° C. so as to convert the organic portion of the waste substantially to a gas comprising hydrogen, carbon monoxide and carbon dioxide, and entrained carbon particulate, and to convert the inorganic component of the waste substantially to molten material. The gas exits the processing chamber as an off-gas at a temperature of at least about 875° C. to 1000° C.

The waste processing system in accordance with the invention removes the molten material from the processing chamber and subsequently cools it to form a non-leachable solid material, and or alternatively a recyclable metal.

The waste processing system in accordance with the invention monitors the amount of carbon particulate entrained in the off-gas and the carbon monoxide/carbon dioxide ratio of the off-gas. When an excessive amount of carbon particulate is detected in the off-gas, an oxidant is injected into the processing chamber in an amount effective

**4**

to convert a majority of the carbon particulate to carbon monoxide. The amount of the oxidant injected into the processing chamber is under process control so as to simultaneously minimize the formation of carbon dioxide, while maximizing the conversion of carbon to gas.

To prevent the formation of complex organic compounds from the off-gas, the waste processing system in accordance with the invention maintains the temperature of the off-gas above at least about 875° C. until it is cooled rapidly to a temperature below about 150° C. During the cooling of the off-gas, a portion of the particulate is separated from the cooled gas. Further downstream, any acidic gases in the cooled off-gas are neutralized and the remaining portion of the particulate is separated out to form a product gas which comprises substantially hydrogen and carbon monoxide. The separated carbon particulate is introduced into the processing chamber for further processing. The composition of the product gas is continuously monitored so as to determine the effectiveness of the oxidant injections.

The waste processing system in accordance with the invention also provides for the safe feeding of waste materials to the combustion processing chamber. A method and apparatus are disclosed by which waste is isolated from the surrounding environment before being crushed, shredded, mixed and subsequently conveyed for pyrolysis. The waste is fed into a first collection means after which the first collection means is closed to the surrounding environment. The waste is subsequently discharged into a second collection means, after which the second collection means is closed to the first collection means and the surrounding environment. Thereafter the waste is ground and mixed to blend solids and liquids in the waste. The gas from said second collection means is also vented into the processing chamber.

A disinfectant system is also provided to spray disinfectant into the second collection means, with the disinfectant then being conveyed to the processing chamber for destruction.

The invention also utilizes a processing chamber which includes upper, lower and intermediate sections, which are assembled in an airtight construction.

A method of treating waste in accordance with a preferred embodiment of the invention is also described herein.

### BRIEF DESCRIPTION OF THE DRAWINGS

In the accompanying drawings:

FIG. 1 is a schematic diagram of an apparatus for treating hazardous waste in accordance with a preferred embodiment of the invention;

FIG. 2 is an illustrational view of a waste feed system and processing vessel of an apparatus in accordance with the invention;

FIG. 3 is a partially schematic view of a particulate monitoring system of the apparatus in accordance with the invention, and

FIG. 4 is a cross-sectional view of the processing or combustion chamber of the invention.

### DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

With reference to the drawing figures, the waste processing system of the invention will be described hereinafter in detail. The system is particularly suitable for treating medical type waste. Referring to FIG. 2, the system includes a

PEAT 163675

5,534,659

waste feed system 10 for feeding medical waste "W" into a waste processing or combustion chamber 20 at a controlled rate. The waste feed system 10 feeds a stream of shredded and compact waste into the processing chamber in a continuous manner. The medical waste may consist of organic and inorganic components and be in the form of solid or liquid material. It may include bags of infectious waste, including blood-soaked sponges, bandages, containers of sharps such as needles, razors, scalpels and other instruments. The system is further capable of processing non-infectious wastes comprised of bags and boxes of office waste, cafeteria waste, facilities maintenance waste such as wooden pallets, oils, grease, discarded light fixtures, yard waste and pharmaceutical waste.

Bags of infectious waste cannot be shredded or mixed before being processed, but some mixing to allow fluid waste to be dispersed and absorbed in the paper and cloth in the waste, is desired. To ensure that adequate mixing occurs, the feed system in accordance with the invention is sufficiently robust to process large metallic and glass containers, and to crush, shred and mix the material as it is fed into the chamber.

The feed system 10 for medical type waste illustrated in FIG. 2 includes a charging hopper 11 positioned directly above a feed hopper 12. An airlock door 13 functions as a sliding cover for the charging hopper. When waste is to be placed in the charging hopper, the door 13 is moved into the opened position as shown. After charging is completed, the door 13 is closed in the direction of arrow "A" to cover the charging hopper. A second, alternately opening, sliding airlock door 14 separates the charging hopper 11 from the feed hopper 12 when in its illustrated closed position. To charge the feed hopper, the door 14 is opened in the direction of arrow "B" while door 13 is closed, so as to prevent the release of any emissions from the feed hopper and the processing chamber into the environment. Each door is provided with appropriate seals which cooperate with seals in the side walls of the charging hopper 11 to prevent any emissions from leaking from the feed system.

A cantilevered conveyor screw or auger 16, driven by a variable speed motor "M", shreds, mixes, compresses and extrudes the waste charge. A feed or conveyor tube 17, which includes a water-cooled jacket 17', surrounds the cantilevered screw and minimizes heat transfer to the feed system. A water-cooled feed tube slide gate 18 is provided at the inlet port of the processing chamber to isolate the feed tube from heat when the feed process is stopped for any significant length of time. The opening and closing of the gate may be automatically controlled.

A vent system 15 is provided between the feed hopper and the processing chamber through which fumes and vapors from the medical waste that are released in the feeding system are drawn into the processing chamber 20 as a consequence of a vacuum pressure being maintained therein by a draft fan 19 disposed downstream (see FIG. 1).

The interior of the feed hopper 12 is relatively open and free of obstructions and contains minimal crevices or cracks in which infectious material can accumulate. This design allows the feed hopper and the cantilevered screw 16, the only moving part in the feed hopper, to be easily disinfected by a disinfectant system 21. The disinfectant system 21 includes a supply container 22 in which an appropriate disinfectant is retained. The preferred disinfectant is a 6% solution of hydrogen peroxide because the solution does not add any new elements, and it contains no chlorine which would have to be later neutralized. The container is con-

nected by supply line 23 to at least one injector nozzle 24 mounted within the feed hopper 12. The disinfectant is pressurized by a pump 25. It is important that the nozzles are arranged to ensure that the entire area within the hopper is subjected to the disinfectant spray so that no toxic or hazardous emissions are encountered when the hopper is opened. After it is applied, the disinfectant drains into the processing chamber and is processed as waste.

During operation, the cantilevered screw 16 forms the liquid and solid waste together into a dense cylindrical plug. The waste is introduced into the processing chamber 20 at a controlled rate so as to expose a controlled amount of surface area of compacted material to the pyrolysis process to regulate the formation of product gases. The feed rate is dependent on the characteristics of the waste and the temperature and oxygen conditions within the processing chamber. The waste is preferably continuously fed into the processing chamber.

In accordance with the invention, the feed rate is initially calculated based on an estimated energy requirement to process the specific waste type being treated. The preferred feed rate is determined by actual operation of the system, and is selected to maintain a preferred average temperature within the processing vessel. A plasma torch 35 described in greater detail hereinbelow, inputs energy into the processing chamber, and the contained waste absorbs the energy in the pyrolysis process. An excessive feed rate maintained for a period of time causes the interior temperature to decrease. Conversely, an inadequate feed rate causes the chamber to overheat. Accordingly, the proper feed rate is selected to achieve the preferred average temperature.

A system in accordance with the invention is capable of processing approximately 1000 pounds of waste per hour, using a 500 kW plasma torch. A system including a torch of about one-half of this power rating and a proportionally smaller processing vessel processes about 500 pounds per hour. It is estimated that these systems are of approximately the necessary size to meet the needs of average sized hospitals. A regional processing center serving numerous hospitals in a large city may use a 1000 kW torch and process up to approximately 25 tons of waste per day.

As the waste material is introduced into the processing chamber, it absorbs energy by convection, conduction and radiation from the plasma flame, the heated refractory lining and the heated gases circulating in the vessel. As the organic portion of the waste material is heated, it becomes increasingly unstable until it eventually dissociates into its elemental components, mainly carbon and hydrogen. Oxygen and the halogens are also liberated if present in the waste. The time required to achieve dissociation varies slightly for different materials, but is typically milliseconds for most compounds at 1100° C. With reference to FIG. 1, the liberated hydrogen gas expands rapidly and flows from the vessel to the off-gas piping 26, carrying with it a portion of any fine carbon particulate generated by the dissociation of the waste.

The known waste treatment apparatuses which use batch feed systems experience surges of released gases when large masses of plastics and other compressible organic materials expand and decompose rapidly in the intense heat. Such surges suddenly generate a large amount of free carbon. The amount of carbon produced is dependent on the amount of organic compounds and available oxygen in the waste. Unless the carbon is oxidized before it exits the processing chamber, an undesirable heavy particulate load is carried downstream into a gas quencher 65 and a gas scrubber 68 (see FIG. 2).

CONFIDENTIAL RESTRICTED ACCESS

PEAT 163676

CONFIDENTIAL RESTRICTED ACCESS

7

With reference to FIG. 4, the processing chamber 20 is a plasma arc furnace which includes a refractory lined vessel which, in the preferred embodiment, is generally cylindrically shaped and constructed in three sections. The processing chamber is preferably vertically oriented as shown. The vessel is designed to withstand temperatures of up to about 1850° C. in a reducing atmosphere. The vessel includes a central cylindrical section 28, an upper, generally semispherical section 29 and a lower, generally semi-spherical section 30. The sections are assembled at flanged joints 31 and 32 so as to provide an airtight structure. The conveyor feed tube 17 is mounted through the wall of the central section 29 as is the vent system tube 16.

A conventional plasma arc torch 35 is mounted through an inclined torch receptacle opening 36 provided in the central section. An access and viewing port 38 is also provided in the central section. A gas vent or outlet 40 is provided in the upper section 29 of the processing chamber. The gas vent system is designed to convey gas at a temperature of about 875° C.–1000° C. to the gas quencher 65. The gas pipe 26 is designed to be airtight to prevent the hot gas from igniting. It is also refractory lined to maintain gas temperatures above about 875° C.

The lower section 30 of the processing chamber 20 includes a vitreous slag tap 42 which is controlled by a tap positioning system 43. The slag(s) forms a pool "S" in the lower section. The tap is of a suitable diameter to allow overflow 'tapping of the glassy slag. Metal residue, if it accumulates, can be tapped through a bottom tap 46, which allows the chamber to be emptied.

An injector 45 is also mounted in the upper section 29 of the processing chamber. The injector supplies oxygen, preferably in the form of steam, within the vessel, so as to regulate the products of pyrolysis as will be discussed in greater detail hereinbelow.

The plasma arc torch 35 emits a plasma flame which heats the interior of the processing chamber 20 to a uniform temperature preferably in the range of from about 1400° C.–1850° C. A non-transferred type torch is preferred for treating medical type waste being high in organics. In comparison to transferred type torches, non-transferred type torches offer the advantages of simpler mechanical control requirements as continual torch motion is not required, greater bulk gas heating capability, increased arc stability, especially during the heat up period, simplified furnace design, and overall greater system reliability.

The plasma heating system further includes a power supply, a plasma gas compressor and a cooling system (not shown).

Because the processing chamber 20 is constructed in sections, the replacement of those sections which are subject to greater wear and maintenance problems, such as the lower section, is facilitated at reduced cost and system downtime.

As illustrated in FIG. 2, the feed of material into the processing chamber from the feed tube 17 is such that the waste is introduced into the molten slag "S" which forms in the lower section 30, rather than being directly injected into the plasma flame "F". Introduction of the waste into the slag improves the capture of metals in the vitreous material and minimizes their entrainment into the effluent gas.

The waste processing system is designed to minimize surges of carbon particulate during the pyrolysis process. The system includes a process monitor and controls 50 (see FIG. 1) which includes a programmable logic controller having an imbedded microprocessor (not shown), and various controls and monitoring devices. This subsystem monitors process variables that are subsequently used to control other process variables to achieve the desired end product of the waste treating process. The system is designed to control the reformation of the organic compounds from the separated elemental components. Thus is achieved by controlling various process temperatures and pressures and also the injection of an oxidant into the processing chamber 20 to gasify any excess carbon so as to maximize the percentages of hydrogen and carbon monoxide, and minimize the percentages of carbon dioxide, carbon particulate, and reformed complex organic compounds, in the pyrolysis product gas stream.

8

The thermal decomposition (pyrolysis) of hydrocarbons releases solid carbon and hydrogen gas. Hydrocarbon derivatives also contain varying amounts of oxygen, nitrogen and halogens such as chlorine. Oxygen and chlorine are free to react with the abundant carbon and hydrogen and may theoretically reform a wide array of complex organic compounds. Such complex compounds cannot form at the high temperatures reached within the processing chamber at which only a limited number of simple compounds are stable. The most common and stable of these simple compounds are carbon monoxide and hydrogen chloride. There is normally an insufficient amount of oxygen liberated from the waste material to convert all of the solid carbon to carbon monoxide gas. As a result, fine carbon particulate is entrained and carried out of the processing chamber by the hydrogen dominated gas stream. Moisture in the waste liberates additional oxygen. But unless the waste moisture content is uniformly distributed throughout the waste and, exceeds at least about 30% by weight, an additional source of oxygen is required to maximize this conversion.

The amount of oxygen added must be closely controlled, however, because if excessive oxygen is added into the process, combustion occurs and forms undesirable carbon dioxide. The amount of oxidant injected into the processing chamber is under process control. More particularly, it is determined by two monitoring systems; a first monitor 51 for monitoring the amount of carbon particulate entrained in the gas stream as it exits the processing chamber, and a second gas monitor 52 located proximate to the first monitor 51, or alternatively located downstream of the first monitor for monitoring the composition of the product gas.

In the processing chamber 20, organic waste decomposes rapidly to its stable basic constituents of mostly hydrogen gas, carbon monoxide, carbon particulate and possibly hydrogen chloride. The waste processing system includes means for injecting an oxidant into the processing chamber in an amount effective to convert a major portion of the carbon particulate to carbon monoxide. The injection means is preferably an oxidant supply system 53 which includes a steam generator 53' and a steam valve 54 which is opened in a controlled manner to supply steam to the injector 45 which injects predetermined amounts of steam into the processing chamber. The steam injected into the processing chamber converts the free carbon into primarily carbon monoxide. The carbon monoxide is a desirable end product because it has fuel value and can be combined with the hydrogen gas to form a product gas which can be utilized by an energy recovery system 70. By limiting excess oxygen, the formation of metal oxides, nitrogen oxides and sulfur oxides is minimized.

The fuel gas product can, for example, be burned in a boiler, used to power fuel cells, reformed into methanol with catalytic converters, or used to power a turbine to generate electricity.

After the oxidant is injected into the processing chamber, turbulence is created in the chamber to thoroughly mix the

PEAT 163677

CONFIDENTIAL RESTRICTED ACCESS

5,534,659

9

carbon and steam to maximize gasification of the carbon. The processing chamber includes a turbulent region 47 (see FIG. 2) into which the oxidant is injected and through which the exiting gas and entrained carbon are forced to pass. The carbon and oxidant must remain in the turbulent region for an effective amount of time for the oxidation reaction to occur.

The residence time is the amount of time that the gas and entrained particulate and steam remain in the high temperature region of the processing chamber and the gas piping. Residence time is a function of the gas flow rate and the distance it travels. At the highest gas flow rate, the volume of the turbulent region and the gas piping that carries the gas to the quencher are such so as to ensure a sufficient residence time. The turbulent region improves the probability of reaction between carbon and oxygen without having to increase the chamber volume and residence time.

The proper amount of oxidant injected into the processing chamber 20 is determined downstream and in the off-gas piping 26 by the first monitor 51 which measures the amount of free carbon in the gas stream as it exits the processing chamber. As illustrated in FIG. 3, the first monitor 51 preferably includes a tap having small viewing holes 56 in the refractory lining of the outlet gas piping 26 from the processing chamber. The viewing holes are fitted with stainless steel pipes 57, water-cooled jackets 58 surrounding the pipes, nitrogen purge ports 59, glass pressure windows 60, a light source 64 and a detector 62. The detector continuously monitors the gas leaving the processing chamber to measure carbon particulate.

The first monitor illustrated in FIG. 3 uses a light source 64 of a specified wavelength that travels across the gas pipe to the detector 62. The amount of light that reaches the detector is dependent on the density of particulate in the gas. The particulate causes scattering and dispersion of the light emitted from the light source.

The output from the detector 62 goes to a signal processor 63 connected to the process monitor and control 50 which includes means for controlling the amount of steam injected into the processing chamber. The controlling means preferably comprises a number of logic devices. The detector identifies surges of carbon particulate in the gas stream that follow the rapid decomposition of organic material and sends a corresponding signal to the signal processor, which processes the signal and directs it to the logic devices. The logic devices control the opening of the steam valve 53 to cause oxidant to be immediately injected into the processing chamber until an acceptable carbon particulate level has been restored.

The gas formed from the dissociation and partial oxidation of organic material is heated to at least about 900° C.–1150° C. in the processing chamber. The waste processing system comprises means for maintaining the temperature of the off-gas above a predetermined temperature until it reaches a means for cooling the off-gas to a temperature of less than about 150° C. and for separating a portion of the entrained carbon particulate from the cooled off-gas. The cooling means is preferably quencher 65. The off-gas is transported from the outlet port 40 of the processing chamber to the quencher through piping 26 which is thermally insulated to maintain the gas temperature above about 870° C. until it reaches the quencher. The quencher is preferably as close to the processing chamber as possible, in order to minimize heat loss and cooling until the gas is rapidly cooled below about 150° C. High temperature thermocouples monitor the gas temperature prior to the steam injection zone and downstream proximate to the inlet of the quencher.

10

Various operating parameters are used to maintain the gas temperature within the preferred operating range. The operating gas temperature inside the main chamber is a function of balancing the torch power input and the feed rate. The torch provides the necessary amount of heat to maintain a minimum bulk chamber temperature which determines the gas temperature. The waste absorbs heat energy as it is fed into the chamber. Because the torch power is primarily fixed by its size and operating parameters, the waste feed rate is used to prevent the chamber from overheating, and thereby to regulate the chamber temperature. Another parameter which influences temperature is the amount of combustion oxidation which occurs to form carbon dioxide. Allowing additional excess steam into the chamber allows a larger percentage of carbon to oxidize to carbon dioxide. This reaction is exothermic, and it releases additional heat which tends to raise temperature. In accordance with the invention, this reaction may be promoted to raise temperatures at the beginning of the waste treatment process, however, it lowers the fuel quality of the product gas and accordingly is not a preferred aspect of the process.

In the quencher 65, the gas is rapidly cooled with water sprays to a temperature of about 150° C. or less to prevent the formation of complex organic compounds. Recirculating water is sprayed as a very fine mist along the axis of the gas pipe that the gas moves through. As the hot gas contacts the spray, the quench water is quickly heated and evaporative cooling quickly lowers the gas temperature to prevent the reformation of complex organic molecules. The action of the sprays also washes out a portion of the carbon and metal particulate entrained in the gas. The particulate is removed by a particulate recycling system 66 and introduced into the feed system through conduit 67. The quench water is recirculated and reused.

After the gas is cooled by the quencher 65, it is drawn by the draft fan 39 into a means for neutralizing acidic gases in the cooled off-gas and for separating substantially the remaining portion of the carbon particulate therefrom so as to form a product gas. This means is preferably a wet gas scrubber 68. The chlorinated organic materials often found in hospital and other organic waste decompose and in the hydrogen rich gas, reform as hydrogen chloride. This compound is neutralized in the scrubber by reacting it with a basic neutralizing agent to form salts, as the pyrolysis gas travels through the scrubber.

The particulate that is washed out of the gas by the scrubber 68 are filtered out of the scrubber water by the particulate recycling system 66 and then dewatered and fed into the feed system 10 through conduit 67 for further processing. A water handling system 72 supplies required amounts of makeup water and a neutralizing agent to the quencher 65 and scrubber 68 by way of a water supply 73 and a neutralizing agent supply 74, respectively. The water handling system also provides a discharge to a sewer 75.

After the cooled gas leaves the gas scrubber 68, it passes to the second gas monitor 52 which preferably comprises an off-gas monitor for monitoring the composition of the product gas. The gas monitor includes a thermal conductivity analyzer to to measure the percentage of hydrogen, and an infrared analyzer 77 to measure the percentages of carbon dioxide, carbon dioxide and methane, as a representative of total hydrocarbons, in the scrubbed gas. The infrared analyzer provides a general measure of the proportions of carbon and oxygen in the process and this measure is used to determine overall process balance.

For example, the second gas monitor 52 can be used to determine if there are any air leaks in the system. Such leaks

PEAT 163678

CONFIDENTIAL RESTRICTED ACCESS

5,534,029

11

are indicated by low total percentages of hydrogen, carbon monoxide, carbon dioxide and methane. If air, being about 80% nitrogen, is leaking into the system, the total percentage of the four gases will be less than approximately 92-94%. The gas percentages also indicate that the system is operating properly.

As explained above, an objective of controlled pyrolysis is to convert the liberated carbon solids from the organic waste into carbon monoxide which has fuel value. If too much oxygen is present, combustion will occur and convert carbon into carbon dioxide which has no fuel value. The waste processing system in accordance with the invention achieves a balance between the amount of liberated carbon and the amount of oxygen permitted to react with it. Because pure carbon is more reactive at the high operating temperature than is carbon monoxide, additional oxygen injected into the chamber reacts with the carbon and forms additional carbon monoxide, and not with carbon monoxide to form carbon dioxide. Carbon dioxide is also relatively less stable at the processing temperatures than carbon monoxide.

The amount of carbon liberated when processing medical waste varies with the amount and type of organic materials fed into the processing chamber. Generally, the amount of oxidant needed to accomplish the desired gasification of the carbon can be determined by monitoring the percentages of carbon monoxide, carbon dioxide and methane in the product gas stream. As the waste composition in the feed varies, however, temporary, rapid changes occur in the amount of carbon liberated. Accordingly, an immediate adjustment in the amount of oxidant injected into the processing chamber is required to prevent accompanying surges in the amount of carbon exiting the processing vessel. This requirement mandates having a monitoring device, namely the first monitoring means 51, proximate to the processing chamber to measure carbon particulate at the high gas temperature and direct a timely response from the oxidant injection system to increase the amount of oxygen injected until the amount of free carbon has been reduced to an acceptable level.

The inorganic waste materials such as non-toxic metals, toxic heavy metals, ceramics and glasses melt in the processing chamber at a temperature of about 1650° C. The molten material formed is composed of glass-like slag and, in some instances, a metal layer, which are separable.

As explained above, the waste processing system includes means for removing the molten material from the processing chamber. Referring to FIG. 1, the removing means preferably comprises the tap device 42, a sealed water tank 60 and a solid residue handling system 81. The molten material passes through the tap device and into the sealed water tank, where the material is rapidly quenched and caused to fracture into smaller pieces. The solid glassy slag is essentially inert because the heavy metals are bound within it. Consequently, the glassy slag resists leaching in the solid state.

The orientation of the torch with respect to the processing chamber is such that the flame of the torch is directed to the area of the tap device 42. The increased heat transfer from the torch flame to the tap area (and the molten glass as its level reaches the tap hole) promotes a continuous flow of molten glass through the tap hole as the level of glass builds up from scrap glass and metals in the waste feed. If the tap area requires additional heating to start the flow of glass through the hole, the torch can be lowered so as to increase its heat transfer directly to the tap area. The tap hole can be sealed during standby periods by a tap positioning device 43 which closes the tap hole to minimize heat loss. Over a

12

span of time, a layer of metals may accumulate below the glassy slag. Certain metals such as iron do not react readily with the silicates. The glassy material absorbs some of these metals, but the metals may accumulate if a large amount is in the waste stream. This is not a serious problem, however, and if the metals eventually fill the basin, they can be drained through the bottom tap 46 and recycled as scrap metal. The bottom tap 46 is also sealed by the tap positioning device 43 and can be mechanically opened for draining.

The solid residue handling system 81 preferably includes a conveyor or other suitable device 82 for moving the solid slag to a bin 85 for transport and disposal.

The scrubbed gas is transported to an energy recovery system 70. Entrained moisture can be removed by conventional equipment if necessary. The gas formed from the thermal decomposition (pyrolysis) of organic materials is rich in hydrogen and carbon monoxide. This composition of gas is a usable fuel gas and can be used to recover the energy that was in the waste materials as described hereinabove.

The above-described waste processing system in accordance with the preferred embodiment of the invention overcomes a number of disadvantages of the known waste treating systems with respect to the complete and safe processing of substantially all medical related waste. More particularly, the waste processing system is able to process a wide variety of hazardous and non-hazardous, inorganic and organic, medical waste components, containing varying amounts of moisture, and simultaneously comply with all of the applicable air and water emissions standards. The plasma heating system maintains a constant high temperature in the processing chamber and controls the temperature of the off gas to produce an end product containing minimal hazardous organic molecules. The waste processing system produces solid residues in the form of glass-contained metals which pass TCLP tests and accordingly can be recycled or reused. Further, the apparatus and method of the present invention are not limited to the safe disposal of hospital, medical and related toxic and hazardous waste but are also effective for use in the safe disposal of chemical wastes and the like.

It will be understood by those skilled in the art that the waste processing apparatus in accordance with the invention is suitable for treating waste material other than medical waste. For example, the waste may be paper waste and the like. For such non-hazardous and non-toxic types of waste, the assemblies may be modified to eliminate various components such as the disinfectant system, the airlock doors and the like system, which are preferred for treating medical waste.

The foregoing description of the preferred embodiment of the invention has been presented to illustrate the principles of the invention and not to limit the invention to the particular embodiment illustrated. It is intended that the scope of the invention be defined by all of the embodiments encompassed within the following claims, and their equivalents.

What is claimed is:

1. Apparatus for treating waste consisting of inorganic and organic components, comprising:

a waste processing chamber;

means for continually feeding waste into said processing chamber at a controlled feed rate;

a plasma torch for heating said processing chamber to sufficient temperature to convert organic components of the waste to a gas comprising hydrogen, carbon monoxide and carbon dioxide, and to particulate

PEAT 163679

2 534,059

## 13

including carbon particulate, and to convert inorganic components of the waste substantially to molten material;

means for withdrawing gas from said processing chamber as an off-gas;

thermally insulated conduit means for maintaining the off-gas at an effective temperature to substantially prevent the formation of complex organic compounds;

means for removing said molten material from said processing chamber;

first monitoring means for monitoring the amount of carbon particulate entrained in the off-gas;

means for injecting an oxidant into said processing chamber in an amount effective to convert a majority of said carbon particulate to carbon monoxide;

means responsive to said first monitoring means for controlling the amount of oxidant injected into said processing chamber so as to minimize the formation of carbon particulate; and

means for rapidly cooling the off-gas from said effective temperature to a temperature of less than about 150° C. and for separating the particulate from the cooled off-gas to form a product gas.

2. The apparatus of claim 1, wherein the feeding means comprises an auger surrounded by a cooled feed conveyor, and a motor for driving said auger at a controlled speed.

3. The apparatus of claim 2, wherein the feeding means further comprises a charging hopper into which waste is charged, a feed hopper positioned below said charging hopper, a first sliding door which allows charging of said charging hopper in an opened position and which forms a gas-tight cover for said charging hopper in a closed position, a second sliding door disposed between said charging hopper and said feed hopper which provides communication therebetween in an opened position and forms a divider therebetween in a closed position, said first and second doors being alternately operable, and said auger extending from said charging hopper and said conveyor extending to said processing chamber.

4. The apparatus of claim 1, wherein said molten material comprises molten metal and molten slag, said removing means comprises a first tap for draining said molten metal from said processing chamber and a second tap for draining said molten slag from said processing chamber, means for positioning said first and second taps, a cooling vessel in communication with said second tap for cooling the drained molten slag to form a non-leachable solid material, and means for conveying the solid material away from said cooling vessel.

5. The apparatus of claim 3, further comprising a means for drawing the off-gas from said processing vessel and through the cooling means and the neutralizing means, and for maintaining a partial vacuum in said processing chamber.

6. The apparatus of claim 5, further comprising a vent system extending between said feed hopper and said processing chamber through which gas in said feed hopper vents into said processing chamber.

7. The apparatus of claim 3, further comprising a disinfecting system for injecting a disinfectant into said feed hopper, said disinfecting system including a spray nozzle mounted within said feed hopper above said auger, and means for connecting said spray nozzle to a disinfectant supply.

8. The apparatus of claim 1, wherein said first monitoring means comprises at least one viewing opening, and thermally insulated conduit means, and a detector proximate to said viewing opening for detecting the concentration of carbon particulate in the off-gas.

## 14

9. The apparatus of claim 8, further comprising a second monitoring means for measuring the percentage of hydrogen, carbon monoxide, carbon dioxide and a hydrocarbon gas in the product gas.

10. The apparatus of claim 9, wherein the oxidant is steam and the injecting means comprises a steam generator and a steam valve which is openable to inject steam into said processing chamber.

11. The apparatus of claim 10, further comprising a signal processor for receiving signals from said monitoring means controls the opening of said steam valve to inject steam into said processing chamber in controlled amounts in response to receiving signals from said signal processor indicating an excess amount of carbon particulate is entrained in the off-gas and receiving signals from said second gas monitoring means indicating an overall balance in carbon oxidation.

12. The apparatus of claim 11, wherein said waste processing chamber includes a turbulent region at which steam is injected.

13. The apparatus of claim 11, wherein said first monitoring means includes a pipe extending from said viewing opening in said thermally insulated conduit means and having an intermediate portion at an outer end, means for cooling said pipe, a glass pressure window mounted along said intermediate portion of said pipe, and said detector being mounted to said outer end of said pipe.

14. The apparatus of claim 1, further comprising an energy recovery system for recovering energy from the product gas.

15. The apparatus of claim 1, further comprising a first thermocouple disposed at said processing chamber and a second thermocouple disposed proximate to said cooling means.

16. A method for treating waste consisting of organic and inorganic components, comprising the steps of:

providing a waste processing vessel having a processing chamber;

feeding waste into said processing chamber at a controlled rate;

providing a plasma arc torch;

treating said waste in said processing chamber using said plasma arc torch to convert organic components of the waste to a gas comprising hydrogen, carbon monoxide and carbon dioxide, and to particulate including carbon particulate, and to convert inorganic components of the waste substantially to molten material;

withdrawing off-gas from said processing vessel through a thermally insulated conduit to maintain the off-gas at an effective temperature to substantially prevent the formation of complex organic compounds;

removing said molten material from said processing chamber;

monitoring the amount of carbon particulate entrained in the off-gas by use of a first monitor;

injecting an oxidant into said processing chamber in an amount effective to convert a majority of said carbon particulate to carbon monoxide;

rapidly cooling the off-gas from said effective temperature to a temperature of less than about 150° C.;

separating the particulate from the cooled off-gas so as to form a product gas comprised of from about 45% to about 55% of hydrogen and from about 30% to about 40% of carbon monoxide; and

CONFIDENTIAL RESTRICTED ACCESS

PEAT 163680

1200

15

monitoring the composition of the product gas using a second gas monitor.

17. The method of claim 16, wherein the step of feeding comprises grinding and mixing solids and liquids in the waste and thereafter delivering the waste into the processing chamber.

18. The method of claim 17, wherein said step of feeding includes introducing the waste into a first collection means, closing said first collection means to the surrounding environment, discharging the waste into a second collection means, closing said second collection means to said first collection means and the surrounding environment, and thereafter grinding and mixing solids and liquids in the waste.

19. The method of claim 16, wherein the step of removing comprises draining molten slag from said processing chamber through a tap, cooling the drained molten slag in a cooling vessel in communication with said tap to form a non-leachable solid material, and conveying the solid material away from said cooling vessel.

20. The method of claim 16, wherein the first monitor measures the amount of particulate in the off-gas.

21. The method of claim 20, wherein the second gas monitor comprises means for measuring the percentages of hydrogen carbon monoxide, carbon dioxide and a hydrocarbon gas in the product gas.

22. The method of claim 16, wherein the step of injecting comprises generating steam and injecting controlled amounts of the steam into said processing chamber through a selectively openable steam valve.

23. The method of claim 22, wherein steam is injected into said processing chamber in response to said first monitor indicating an excess amount of carbon particulate being contained in the off-gas and said second gas monitor indicating a process balance of hydrogen, carbon monoxide, carbon dioxide and hydrocarbons in the product gas.

24. The method of claim 23, further comprising the step of mixing the carbon particulate and injected oxidant together at a turbulent region of said waste processing chamber for an amount of time effective to achieve substantially complete conversion of the carbon particulate to carbon monoxide.

25. The method of claim 16, further comprising the step of recovering energy from the product gas.

26. The method of claim 16, further comprising the step of maintaining a vacuum pressure in said processing chamber.

27. The method of claim 26, in which said step of feeding includes introducing the waste into a first collection means, closing said first collection means to the surrounding environment, discharging the waste into a second collection means, closing said second collection means and the surrounding environment, after grinding and mixing solids and liquids in the waste, venting gas from said second collection means to said processing chamber.

28. The method of claim 16, wherein the thermally insulated conduit extends between an exit port of said processing chamber and an inlet port of the cooling means, and further comprising detecting the temperature of the off-gas at said exit port and at said inlet port.

29. The method of claim 16, wherein the step of feeding comprises feeding medical waste into said processing chamber at a controlled feed rate.

30. An apparatus for treating toxic and hazardous medical waste consisting of inorganic and organic components comprising:

16

said processing chamber;

a collection means for receiving a charge of waste, a sealing means for closing said first collection means to the surrounding environment so as to isolate the charge of waste therein, a second collection means for receiving waste from said first collection means, a second sealing means for closing said second collection means to said first collection means and the surrounding environment so as to isolate a charge of waste received therein;

conveyor means for continually feeding waste to said processing chamber at a controlled feed rate;

means for applying a vacuum pressure within said processing chamber;

means for venting said second collection means to said processing chamber;

a plasma arc torch mounted within said processing chamber for heating said waste to convert organic components of the waste to a gas comprising hydrogen, carbon monoxide and carbon dioxide, and to particulate including carbon particulate, and to convert inorganic components of the waste substantially to molten material, the gas exiting said processing vessel as an off-gas;

thermally insulated conduit means for maintaining the off-gas at an effective temperature to substantially prevent the formation of complex organic compounds;

an oxidant supply system for injecting an oxidant into said processing chamber in an amount effective to convert a majority of said carbon particulate to carbon monoxide;

a control system for controlling the amount of oxidant injected into said processing chamber so as to minimize the formation of carbon particulate; and

cooling means for rapidly cooling the off-gas from said effective temperature to a temperature of less than about 150° C. and for separating the particulate from the cooled off-gas to form a product gas.

31. The apparatus of claim 30, including a gate means for closing said conveyor means to said processing chamber, and means for cooling said conveyor means.

32. The apparatus of claim 30, further comprising a first monitoring means disposed between said processing chamber and said cooling means for detecting the amount of carbon particulate entrained in the off-gas and means for communicating said first monitoring means to said control system and a second gas monitoring means for monitoring the composition of the product gas.

33. The apparatus of claim 32, wherein said effective temperature is at least about 875° C. and the thermally insulated conduit means extends between an exit port of said processing chamber and an inlet port of said cooling means.

34. The apparatus of claim 30, including a disinfecting system for introducing a disinfectant into said feed hopper, said disinfecting system including a spray nozzle mounted within said feed hopper above said conveyor means, and means for connecting said spray nozzle to a disinfectant supply.

35. The apparatus of claim 30, wherein said processing chamber includes upper, intermediate and lower sections, means for sealing said sections in airtight relationship with one another, and a first tap for draining molten slag from said vessel, and a second tap for draining molten slag from said vessel, the upper, said first and second taps being mounted in airtight relationship through said bottom section.

36. A method for treating waste consisting of organic and inorganic components comprising the steps of:

introducing waste into a first collection means and closing said first collection means to the surrounding environ-

5,534,659

17

ment, discharging the waste from said first collection means to a second collection means, and closing said second collection means to said first collection means and the surrounding environment;

conveying the waste at a controlled rate into a processing chamber;

heating said processing chamber using a plasma arc torch to a temperature effective to convert organic components of the waste to a gas comprising hydrogen, carbon monoxide and carbon dioxide, and particulate including carbon particulate, and to convert inorganic components of the waste substantially to molten material;

maintaining the processing chamber under vacuum to withdraw the gas exiting said processing vessel as an off-gas;

passing the off-gas from the processing chamber through a thermally insulated conduit to maintain the off-gas at an effective temperature to substantially prevent the formation of complex organic compounds;

removing said molten material from said processing chamber, and cooling the removed molten material to form a non-leachable solid material;

18

monitoring the amount of carbon particulate entrained in the off-gas;

injecting an oxidant into said processing chamber in an amount effective to convert a majority of said carbon particulate to carbon monoxide and to minimize the formation of carbon particulate;

rapidly cooling the off-gas from said effective temperature to a temperature of less than about 150° C.; and

neutralizing acidic gases in the cooled off-gas to form a product gas.

37. The method of claim 36, comprising venting said second collection means to said processing chamber.

38. The method of claim 36, further comprising the step of introducing a disinfectant into said second collection means when said second collection means is closed to said first collection means.

39. The method of claim 36, wherein the step of feeding comprises feeding medical waste into said first collection means.